UNITED STATES v. SOUTHERN COLORADO COAL & TOWN Co. and others.[1]

*(Circuit Court, D. Colorado.   November 1, 1883.)*

1. LAND GRANTS AND GOVERNMENT PATENTS—FRAUD—GRANTS TO FICTITIOUS PERSONS.
   It is necessary to the validity of a deed that the grantee should be capable of taking title. A grantee being as necessary to the conveyance of land as a grantor, it follows that a grant to a fictitious person is void; and a patent for land to a fictitious person not in existence carries no title, and invests no interest in any one.

2. SAME—BONA FIDE PURCHASERS FOR VALUE.
   The claim for protection by *bona fide* purchasers of land, for which patents have been obtained by fraud, can only be maintained by showing that the legal title has passed to them: but in a case where the original patents are void, and consequently the title never passed, the doctrine of *bona fide purchasers for value*, and without notice of fraud, cannot be invoked. On the principle that a grantor can convey no more than he possesses, he who comes in under the holder of a void grant can acquire nothing.

3. SAME—LACHES ON THE PART OF THE GOVERNMENT.
   One of the limitations to the general rule that when the government becomes a party to a suit in its own courts it stands upon the same footing as individuals, and must submit to the law as administered between man and man, is that neither the defense of the statute of limitations nor that of laches can be pleaded against the United States. (*U. S.* v. *Beebee*, 17 FED. REP. 36, distinguished.)

4. SAME—EQUITABLE ESTOPPEL.
   *Held*, not to apply, the respondents not being innocent purchasers within the meaning of the rule, and for the further reason that the government cannot be estopped by the frauds or crimes of its public officials.

On Final Hearing.

*W. S. Decker*, Special Assistant United States Attorney, for complainant.

*Lyman K. Bass, Wolcott & Milburn*, and *John M. Waldron*, for respondents.

McCRARY, J.   The important allegation of the bill is that the patentees named in the patents sought to be set aside,—61 in number,—as well as the witnesses by whom proof of pre-emption purports to have been made, were all fictitious persons, having no existence in fact. It is averred that the pre-emption papers, together with the signatures thereto, were fraudulently manufactured by certain conspirators named, or other persons unknown, for the purpose of cheating and defrauding the complainant out of its title to the lands in question. In other words, the contention of the complainant is that the officers of the general land-office were by fraud induced to execute patents to fictitious persons, so that there were in fact no grantees capable of taking title. We will first inquire whether the proof sufficiently shows that is true as matter of fact. The bill sets out the names of the supposed pre-emptors and patentees, to the number of 61, a•d charges that they are myths and fictitious persons, and that the names are fictitious names; that no persons by such

names have ever lived or been known in the county of Las Animas, Colorado, where said lands are situated. It also sets out the names of persons purporting to have appeared as witnesses in these several cases, and makes the same averments as to them.

Although these averments are negative in character, yet as the complainant has made them the basis of its suit, the burden is upon it to show that they are, at least *prima facie,* true. Greenl. Ev. § 78; Whart. Ev. *c.* 7.

The complainant has accordingly called 14 witnesses, who have resided in Las Animas county for a number of years, and who testify that they were well acquainted there, at, before, and since the dates of the several patents, and that during the years from 1870 to 1874 none of the persons named as patentees, with the exception of Juan B. Martine, were known in the county; and as to Martine, the proof is that a common laborer was known in Trinidad of that name, but that he never occupied any of the land in question. It is not probable that he was an actual pre-emptor, if all the other 60 were myths. It clearly appears by the evidence that none of the lands were occupied, or in any way improved, prior to the issuing of the patents, although in each case what purports to be an affidavit of the claimant is filed, setting forth that he is a citizen of Las Animas county, and has made settlement on and improved the land in good faith, etc., describing the improvements.

The proof is very clear that, with the possible exception of Martine, no such persons as those named as patentees either occupied the land or resided within the county at the time that the pretended entries were made. It was then a very new country, but sparsely populated, and it is incredible that so large a number of persons could have lived in the community, and that all could have been unknown to the leading citizens. At all events, the proof produced by the complainant is sufficient to shift the burden and make it necessary for respondents to come forward with proof to show that these supposed patentees were real persons. If such be the fact, it would have been easy for respondents to show it, although quite difficult for complainant to prove the negative. If 61 persons bearing the names of these patentees ever existed and actually appeared before the land-officers at Pueblo as applicants for pre-emption, and if they produced living witnesses to testify for them, it certainly would not be difficult for respondent to identify them, or at least some of them; but if they never existed, it must, in the nature of the case, be difficult, if not impossible, to prove the fact of their non-existence by clear and positive evidence. All that is possible in such a case is to call as witnesses those who would probably have known them, if they had lived at the time and place in question. The fact of their non-existence could be shown in no other way.

It is suggested in the argument that the proof is insufficient, because it only goes to show that none of the patentees' or witnesses

ever lived in Las Animas county, and does not tend to prove that they did not exist elsewhere. It would, however, be manifestly impossible for complainant to call witnesses to testify as to all localities; and besides, each of the supposed patentees must have resided in Las Animas county, and actually occupied and improved the land patented to him, in order to be entitled to a patent at all, and each was required to swear to such residence, occupancy, and improvement. If none of them were ever in the county, and no improvements were ever made upon the land, then the proofs upon which the patents issued were false, and the inference that the papers were manufactured without the presence of any persons bearing or assuming the names of the patentees is not more unreasonable than would be the inference that 61 actual persons committed perjury themselves, and suborned as many others to perjure themselves as witnesses, in order to acquire the title. At all events, I am clearly of the opinion that complainant can be required to do no more than to show that the supposed patentees did not live in Las Animas county, and that the lands in question had neither been occupied nor improved. If this is not sufficient to shift the burden, then it must follow that we should require the complainant to make the same showing with respect to every other community in the United States, and this can scarcely be seriously insisted upon. It would be very difficult to prove that these supposed persons did not exist in all space. "But jurisprudence has to do with no such vague domains. Its territory is limited. It inquires whether in a particular spot, at a particular time, open to human observation, a particular thing existed. \* \* \* It is possible within such limited range to call all witnesses who were likely to have been at the given spot or observed the given persons at the particular time, and so to approach the negative by generally exhausting the affirmative." Whart. Ev. § 356.

The amount of proof requisite to support the negative proposition, and to shift the burden, will vary according to the circumstances of the case; and very slender evidence will often be sufficient to shift the burden to the party having the greatest opportunities of knowledge concerning the fact to be inquired into. Stephen, Dig. Law of Ev. art. 96. In the present case, to hold the respondents bound to produce evidence in support of the affirmative of the proposition—that these supposed patentees were actual persons—is, under the circumstances, both reasonable and just, because the proof of that fact, if it be a fact, is within their reach. The papers could not have been fabricated, as alleged, in the names of fictitious persons, without the knowledge of the register and receiver of the land-office at Pueblo, and the bill distinctly charges that both these officers were parties to the fraud and conspiracy. What purport to be transfers from each of the supposed patentees to one Jackson, as trustee for the Colorado Coal & Town Company, are shown in evidence. Jackson, however, swears that he dealt only with one A. C. Hunt, who brought him

the receiver's certificates properly assigned, and he never saw or knew any of the pre-emptors or patentees. He bought the lands from Hunt and paid him for them, receiving what appeared to be the usual evidence of title. It is fair to presume that Hunt dealt with the actual pre-emptors, if any existed, or, if he did not, he could state with whom he did deal, and thus put the inquirer on the road which would lead him to the original parties, if any such actually existed. It is conceded that the receiver is dead, but no reason appears for not calling either the register or Hunt; and the failure to do so is a circumstance, the significance of which the court is not at liberty to overlook. If the court could suppose that an innocent official, thus accused by a bill filed by the attorney general of the United States, would fail to demand or at least request opportunity to vindicate himself under oath, it would be impossible to doubt that the respondents would have called him if the truth had been otherwise than as the bill alleges. It is insisted that it was the duty of the complainant to call these witnesses; but the court does not think so. The complainant having charged these persons with fraud and conspiracy, should not be driven to the necessity of calling them as its witnesses if it is possible for it to make out a *prima facie* case without doing so. The respondents, whose defense rests, at least in part, upon a denial of the charge of fraud and conspiracy made against these persons, could with perfect safety have called them if the charge is false.

Thus far no notice has been taken of the testimony of experts upon the question whether the signatures to the papers in question appear to be genuine signatures of different persons. The opinions of the expert witnesses differ, as is usual in such cases, but in my judgment this testimony, considered as a whole, confirms the theory that the papers were fabricated.

Having thus reached the conclusion that the supposed patentees in each and all the patents sought to be set aside were fictitious persons, having no existence, it only remains to determine what the consequences are with respect to the present respondents. And for the purposes of this inquiry I will assume that it sufficiently appears that respondents had no actual notice of or participation in the frauds whereby the patents were obtained. The rule of law that a grantee capable of taking the title is necessary to the validity of a deed, is elementary. A grantee is as necessary to the conveyance of land as a grantor, and it follows that a grant to a fictitious person is simply void. 3 Wash. Real Prop. (4th Ed.) 265; *Muskingum Valley Turnpike Co.* v. *Ward,* 13 Ohio, 120; *Hulick* v. *Scovil,* 4 Gilman, (Ill.) 175.

"By the common law all grants between individuals must be made to a grantee in existence, or capable of taking, otherwise there could be no such thing as livery of seizin." *Miller* v. *Chittenden,* 2 Iowa, 368.

"A patent for land to a fictitious person, not in existence, carries no

title, vests no interest in any one." *Thomas* v. *Boerner*, 25 Mo. 27; *Gall* v. *Galloway*, 4 Pet. 332; *Galloway* v. *Finley*, 12 Pet. 297.

The case of *Sampeyreac* v. *U. S.* 7 Pet. 222, was a bill for review, to set aside a former decree in favor of Sampeyreac, vesting title in him under an alleged grant from the governor of Louisiana, while it was a province of France, and which inured to the benefit of the claimant by virtue of the treaty of 1803. The grant and the decree founded thereon were attacked by the United States on the ground that Sampeyreac was a fictitious person. The court, per THOMPSON, J., said: "The original party to the decree being a fictitious person, no title could pass under the patent, if issued. It would remain in the United States." Page 241.

I must hold, therefore, that, the patentees in this case being fictitious persons, no title passed from the United States by virtue of the patents in question.

There could be no conveyance of the title where there was no grantee to take the title. The patents were and are absolutely null and void.

The respondents claim protection as *bona fide* purchasers for value without notice of the fraud; but this defense can only be maintained by showing that the legal title has passed to them. The original patents being void for the want of the necessary grantees, as we have already seen, the title never passed from the United States, and the doctrine in question cannot be invoked. "The purchaser in all cases must hold the legal title, or be entitled to call for it, in order to give him a full protection of this defense; for if this title is merely equitable, then he must yield to a legal and equitable title in the adverse party." Story, Eq. Jur. § 64c. In the case of *Sampeyreac* v. *U. S.*, *supra*, this defense was interposed by the respondent Joseph Stewart, who was allowed to intervene, and plead that he was a *bona fide* purchaser for value and without notice. The court, however, upon hearing, overruled the defense, upon the ground, among others, as stated in the opinion, that "on general principles it is incontestable that a grantor can convey no more than he possesses. Hence, those who come in under the holder of a void grant can acquire nothing." In that case, Stewart purchased upon the faith of a grant which had been confirmed by a decree of a court of equity in Arkansas territory. He was not protected, because both grant and decree were afterwards held fraudulent and void, on the ground that the supposed grantee in the one, complainant in the other, was a fictitious person. The case is certainly as strong as the one before us. And see *Gray* v. *Jones*, 14 FED. REP. 83; S. C. 4 McCrary.

In the light of these principles and authorities, it is impossible to hold that the respondents, or any of them, have acquired a right to the land in controversy by reason of their standing in the character of *bona fide* purchasers. The title has never passed from the United States. A person who has acquired title by fraud may make a valid

conveyance to a *bona fide* purchaser; but one who has never acquired the title cannot convey it, and much less can the title be transferred by fraudulently obtaining from the owner a deed purporting to convey it to a fictitious person, and then forging a conveyance from such fictitious person to another, however innocent the latter may be.

The counsel for respondents have argued very earnestly that, as this is a suit to rescind and set aside a deed for fraud, the rule which requires the injured party, upon discovering the fraud, to give notice of his intention to rescind without delay, applies, and bars relief. The bill was filed in January, 1880. It is insisted that complainant had notice of the fraud as early as November, 1873, through a letter received at the general land-office at Washington from one E. J. Hubbard. The letter is in evidence, and is as follows:

"LAW OFFICE OF GRAHAM,
"TRINIDAD, COLORADO, November 28, 1873.

"*Honorable Commissioner United States Land-office*—SIR: The most gigantic frauds upon the department you control are being perpetrated in this portion of Colorado. Coal lands are being entered as agricultural lands by *straw men*, and conveyances made to the procurers of these perjuries, who pretend to be innocent in the matter. This portion of Colorado is all coal land. Townships 33, 32, and 30, in range 64, are coal lands, (every section,) except a little of the river bottom. There are over thirty townships north of range 33 and west of 63 that have coal on every section, and the agricultural land does not exceed three sections. These parties even sell out, and then apply to the general land-office to change the location of the lands patented. Of this latter I am advised by common rumor.

"The people rely on the laws to protect, and ask the department to assist them in their rights. There is something out of proportion in our land-office. "The register and receiver are charged with complicity in these things.

"If the United States attorney will take the matter in hand, the matter can be fastened on the proper parties; but in the mean time, unless your department is vigilant, and dishonest men thwarted, the government is defrauded of thousands of acres of its most valuable coal lands. I am, very respectfully,
E. J. HUBBARD."

[Indorsed:]
Letter K, No. 78,067, E. J. Hubbard, Trinidad, Colorado territory, November 28, 1873. Alleges fraud on the government, etc. Answered December 11, 1873. Referred to Div. N. Received (G. L. O.) December 3, 1873.

It will be observed that this letter designates no particular entries as fraudulent, and describes no particular lands that were being fraudulently entered. The writer's purpose, which was most laudable, seems to have been to induce the land department to institute an investigation. It is more than doubtful whether this letter can be regarded as a sufficient notice to the United States of the existence of the particular frauds now in question, even assuming that a volunteered communication from a private citizen to a bureau officer in the interior department could, in any case, be held to charge the government with notice of its contents. Waiving, however, the consideration of this question, I am constrained to hold that laches cannot be imputed to the government. It is true, as a general proposition, that when

the government becomes a party to a suit in its own courts it stands upon the same footing with individuals, and must submit to the law as it is administered between man and man. But this general rule has its limitations, and one of them is that neither the defense of the statute of limitations nor that of laches can be pleaded against the United States. "The general principle is that laches is not imputable to the government; and the maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy. The government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses, if the doctrine of laches can be applied to its transactions." *U. S.* v. *Kirkpatrick,* 9 Wheat. 736; *U. S.* v. *Hoar,* 2 Mason, 311; *U. S.* v. *Williams,* 5 McLean, 133; *Gibson* v. *Chouteau,* 13 Wall. 92; *U. S.* v. *Thompson,* 98 U. S. 486; *Gauson* v. *U. S.* 97 U. S. 584.

If, indeed, the lapse of time since the cause of action accrued has been so great as to afford the reasonable presumption that the witnesses who could testify concerning it are all dead, and the proofs lost or destroyed, a court of equity may, no doubt, on that ground refuse to entertain the controversy. *U. S.* v. *Beebee,* 4 McCrary, 12; [S. C. 17 FED. REP. 36.] But this cannot be claimed upon the facts of the present case. At most, the lapse of time here was only six or seven years, and it is not claimed that the witnesses who could testify from personal knowledge of the facts are all dead, nor that the proofs have been lost or destroyed. Independently of these considerations, it is difficult to see upon what principle this doctrine concerning the duty promptly to rescind can be applied to a case of this kind, where there never was a contract in the sense of an agreement between contracting parties. The rule requires the defrauded party to give notice, to the party guilty of the fraud, of his purpose to rescind and demand a return of the property conveyed But where the other party has no existence, where the conveyance has been made to a myth, how can this rule be applied? To whom shall notice be given? Upon whom shall demand for a return or reconveyance of the property be made? It is also insisted that the United States has not returned the money received for these fraudulent conveyances, and that, therefore, this suit cannot be maintained without considering whether the government is bound, as a condition precedent to its right to file a bill to set aside a fraudulent patent, to pay or tender to the patentee the consideration received. It is sufficient to say in the present case that there are no patentees, and therefore no one in existence to whom such payment could properly be made.

The counsel for the respondents insist that the complainant ought to be bound by the patents issued, even though the patentees were myths, because the respondents have acted in good faith upon the assumption that they were valid, relying upon the record. It is in-

sisted that the facts present a case of equitable estoppel, upon the theory that "when one of two innocent persons must suffer a loss, it should be borne by that one of them who, by his conduct, acts, or omissions, has rendered the injury possible." It is a conclusive answer to this contention to say that the respondents are not innocent purchasers within the meaning of the rule, as we have already seen. But I think it proper to add that so far as I know it has never been held that the United States can be estopped by the frauds, not to say crimes, of its public officials; and it is apparent that the consequencees of such a doctrine would be ruinous. In my opinion the doctrine of estoppel does not apply.

Upon the whole case my conclusion is that there must be a decree for complainant in accordance with the prayer of the bill, and it is accordingly so ordered.