## KELLEY v. OWENS et al.

### No. 13,804; August 3, 1892.

30 Pac. 596.

**Fraud—Shifting of Burden of Proof.**—Plaintiff asked that an agreement made by her to convey land to defendant for stock in an iron and steel company be canceled, alleging that defendant induced her to make the contract by representing that a new method had been discovered for the cheap manufacture, at a great profit, of a superior quality of fine steel and iron, for which invention a caveat had been filed, and that this company had been formed for the manufacture of steel under this process; which representations plaintiff alleged to be false, and known by defendant so to be. Held, that as these were negative allegations, but little was necessary to shift the burden of proof to the party having the best opportunities for knowledge of the facts, and that testimony of an expert that the process, as given in the caveat, would not produce steel, was sufficient to place on defend-

ant the burden of proving the truth of the representations made by him.[1]

**Fraud—Evidence in Defense.**—In such case, if the representations made by defendant were false, he cannot show that plaintiff did not rely on them by evidence that plaintiff investigated the matter for herself, and expressed herself as fully satisfied, when such investigations consisted merely in asking information from persons to whom she was referred by defendant, and who knew and could know nothing of the process, except what they were told of it by him.[2]

**Fraud—Evidence of Other Frauds.**—Where fraud in the purchase or sale of property is in issue, evidence of other frauds of like character, committed by the same parties, at or near the same time, is admissible.[2]

APPEAL from Superior Court, Contra Costa County; R. Crouch, Judge.

Action by Mrs. H. S. Kelley against William Owens, executor, and Helen M. Owens. From a judgment for defendants, and an order denying a motion for a new trial, plaintiff appeals. Reversed.

D. M. Delmas (Bull & Cleary of counsel) for appellant; Garret W. McEnerney and George Maxwell for respondents.

[1] **Cited** and followed in Del Vecchio v. Savelli, 10 Cal. App. 81, 101 Pac. 33, an action for damages for fraudulent representations whereby one had been induced to buy an interest in barber shops.

Cited and followed in Kornblum v. Arthurs, 154 Cal. 248, 97 Pac. 421, for rescission of a contract for the purchase of land, on the ground that the plaintiff had been induced to enter into it through false and fraudulent representations.

[2] **Cited** and followed in People's Bank of Minneapolis v. Reid, 86 Kan. 250, 120 Pac. 341, in admitting evidence of other transactions to show system, motive or intent on the part of a company in a suit on a contract the defendant was induced to enter into through fraudulent representations.

Cited, along with other cases holding to a similar effect, in Ogden Valley Trout & Resort Co. v. Lewis (Utah), 125 Pac. 692, as opposed to other cases there cited in which courts have held to a contrary effect.

Cited and followed in People's Bank v. Reid, 86 Kan. 250, 120 Pac. 341, where the court adopts language used in Elerick v. Reid, 54 Kan. 579, 38 Pac. 814, thus: "Surely, the attempted dealings of the defendant with other persons, in which he undertook to make the same kind of a bargain as that made with the plaintiff, are well calculated to explain his motives in this transaction."

HAYNES, C.—This was a suit in equity to rescind and cancel an agreement for the sale of land made by appellant with said H. K. Owens, and a conveyance to him of said land pursuant to said agreement. H. K. Owens died after the commencement of the action, and the executor of his estate was substituted. Helen M. Owens, the wife of H. K. Owens, was made a party originally, because of the conveyance of said land to her by her husband. Defendants had judgment, and this appeal is taken from an order denying appellant's motion for a new trial.

Appellant was the owner of 480 acres of land in Colusa county, alleged to be of the value of $20,000, and found by the court to be of the value of $17,000; and on June 5, 1884, entered into a contract with H. K. Owens, by which she agreed to convey said land to him in consideration of 55,240 shares of the capital stock of the Pacific Coast Steel and Iron Manufacturing Company. The said stock was transferred to appellant immediately after said contract was made, and on the 14th of June, 1884, appellant conveyed said land to said Owens. The complaint alleged, in substance, that said Owens, in order to induce plaintiff to exchange said land for said stock, represented that one "Lee was the discoverer and inventor of a new method for the cheap manufacture, at great profit, of a superior quality of fine steel and merchantable iron from pig iron and other iron and iron ore"; that said Lee had secured the right to have his said invention patented; that he (Owens) had aided and assisted Lee in obtaining said right to a patent, and in forming a corporation for the manufacture of said steel by said process—which representations she alleged were false, and known so to be by Owens; that she relied upon them, and believed them to be true, and was thereby induced to enter into said contract and make said conveyance. The complaint further charged that Lee and Owens confederated together to form said corporation for the purpose of defrauding plaintiff and other purchasers of stock, and, in pursuance of said design, made representations similar to those above recited, all of which averments were denied in the answer. The court found the contract, conveyance, and transfer of the stock as alleged. The findings upon the other allegations, upon which issues were raised, are very full, cov-

ering seven pages of the transcript. These findings are to the effect that H. K. Owens did not, for the purpose of inducing the plaintiff to make the conveyance or otherwise, represent that Lee was the discoverer or inventor of the said process, but that he did represent that he "believed Lee was the discoverer and inventor of a new method for the cheap manufacture, at great profit, of a superior quality of fine steel and merchantable iron, from pig iron and other iron and iron ore." The findings further show that Owens represented to plaintiff that Lee had filed a caveat for his said invention; that Owens had advanced from time to time large sums of money to Lee to enable him to perfect his invention, and manufacture specimens of steel; that he had aided Lee in forming said corporation; and that his representations were true. The court further found "that said Lee was, at all times alleged in the amended and supplemental complaint mentioned, the discoverer and inventor of a new method for the cheap manufacture, at great profit, of a superior quality of fine steel and merchantable iron, from pig iron and other iron and iron ore." It was further found that the representations made by Owens to plaintiff were none of them false, or known or believed by Owens to be false, but that each of them was true, and known and believed by Owens to be true; that the plaintiff did not rely upon said representations, or any of them, in making said contract and deed, and was not induced thereby to do so. Appellant, in her motion for a new trial, attacked nearly all of the findings, including those above mentioned, upon the ground that they were not justified by the evidence.

Many witnesses were examined, and the testimony is voluminous. · I think the findings in several particulars covered by appellant's specifications are not sustained by the evidence. Some general facts disclosed by the evidence, and not controverted by counsel, may be first stated. In 1883, Dr. Lee claimed to have discovered the process mentioned in the complaint for the manufacture of steel. He was without financial ability to conduct experiments necessary to perfect his alleged discovery; as Owens stated to the witness Cousins, he (Lee) was very poor, that he had nothing, that he (Owens) furnished him means, and, he thought, even bought him clothes. Under these circumstances, Mr. Owens furnished Lee

a laboratory in the city of San Francisco, where for some time he prosecuted his experiments, and then a plant at Melrose was secured, where it was claimed steel was made by Lee's alleged process. This plant was afterward moved to Martinez, for the purpose of securing better freight facilities, and where a larger plant was to be and was in part erected. In the meantime, in October, 1883, Lee and H. K. Owens organized the corporation known as the Pacific Coast Steel and Iron Manufacturing Company, with a capital stock of 215,000 shares, of the par value of $5 each, and of which stock the complaint alleges, and it is not denied, Lee and Owens had issued to them 115,000 shares, and of which corporation Lee was president and Owens treasurer; three other persons, with Lee and Owens, constituting the board of directors.

1. The representation that Lee was the discoverer and inventor of a new method for the cheap manufacture, at great profit, of a superior quality of fine steel, whether true or false, or whether made positively, or upon belief merely, lies at the foundation of this controversy. The fifth finding is that H. K. Owens did make that representation to plaintiff, but that it was made upon belief, while the tenth finding is that it is true; and, if true, it is immaterial whether it was made as the positive assertion of a fact, or merely as an assertion that he believed Lee was the discoverer of such new process or method. This representation was very comprehensive. It was not merely the discovery of a method of making steel, but of a new method for the cheap manufacture, at a great profit, of a superior quality of fine steel. Then, as now, the manufacture of steel was a great industry. Methods of its manufacture had long been known. The opportunity for anyone to engage in its manufacture by methods theretofore known was open, but by such methods the new manufacturer must compete on not more than equal terms with those who then occupied the field. The inducement, therefore, to engage in this enterprise was a new method, a cheap one, affording large profits, while the product was superior, thus assuring a ready market, and in addition that a caveat protecting the discovery had been filed, thus securing the corporation against competition in the use of the same process. In order, therefore, to justify the tenth finding, something more must ap-

pear than that Dr. Lee discovered a method theretofore unknown to him, by which he could make steel; but the method must be new, in the sense that it was unknown to and unused by all others engaged in the manufacture of steel, while the cheapness of the method, insuring large profits, and the superior quality of the steel, were equally potent elements in recommending it to the favor of investors. The evidence bearing upon the proposition that such discovery or invention was not made by Dr. Lee is voluminous, and is found in parts of the testimony of many witnesses. The alleged discovery or invention is described in the caveat filed by Dr. Lee in the United States patent office, under date of April 12, 1884, copy of which appears in the transcript. Patrick Noble, a witness called on behalf of the plaintiff, testified that he was superintendent of the Pacific Rolling Mills, had been in that business eight years, and was familiar with the manufacture, composition, and handlings of metals, including steel; that he had made a study of that subject, and was familiar with the different processes of making steel that are known to the world; that he had seen the caveat which was in evidence, and had carefully examined the drawing attached to it; that the caveat does not describe any method whatever of making steel; that steel could not be made by following the directions contained in the caveat; that it would spoil the metal; that putting a warm blast on top simply burns the metal; that if the air is put in the metal it would make steel, but would be an infringement of the Bessemer process; that none of the fluxes used are calculated to make steel. No experts were called to contradict this testimony of Mr. Noble. Mr. Hatton, who was in charge of the rolling department in the Pacific Mills, testified that Dr. Lee brought some steel there, that he rolled it for the doctor, but he did not know where it came from. The only thing tending to identify it was that it appeared to have been cased in a railroad bar, or something like that; and defendants' witness Holland testified that he was in Lee's employ, that he was with him at Melrose, that he remembered of steel being sent to the rolling mills, that it was run in a railroad bar, but that he did not see the chemicals put in. This testimony therefore raises no conflict with the testimony of Mr. Noble. It only shows that steel of some quality was made by Dr. Lee at Melrose, but by what method

or process, new or old, cheap or expensive, does not appear. Both Mr. Owens and Dr. Lee exhibited to appellant and others at Martinez specimens of what was represented by them as steel made by Dr. Lee's process at Melrose.

One of plaintiff's witnesses, Alfred F. McMillan, a blacksmith who had worked at his trade continuously more than twenty years, testified that Owens exhibited to him three different pieces of metal professed to be manufactured by Lee's process, and he found them to be common Bessemer steel. This witness further testified that Owens afterward gave him a piece of waste metal and asked witness to test it, and told him it was manufactured the same as the others; that he tested it, and informed Owens that it was only a piece of pig iron decarbonized a little; that it could not be rolled nor hammered; that it was worthless. At this time Owens further said to the witness "the process of manufacturing steel was a secret between him and Dr. Lee"; and Owens then requested witness "not to say anything about it, so as people should not think anything wrong was going on, as I understood." The witness further testified that Lee came to him, and asked if he did not have a piece of steel. "I told him I did,—two pieces of iron,—of those bars Mr. Owens gave me. He asked me what I thought of the steel. I told him it was an ordinary grade of open hearth or Bessemer steel. During the conversation I broke off a piece of this steel and a piece from an old plowshare, and bet the doctor a new hat if he could pick out his from the two pieces, and the doctor said it was hard to tell." Ostello, a witness for appellant, testified that three pieces of steel of different grades were brought to him, that Robbins and Perrin tried some, and both reported to him that it was good. Other witnesses, among them Patrick Noble, examined and tested these specimens—some of them were undoubtedly steel. One bar, Noble testified, "was steel; that it looked like tool steel; that is, high in carbon. That it was an article well known to commerce, coming from Damascus, and has been for centuries, two or three," and "that it was not different from merchantable steel known to commerce for fifteen years or more." I find in the record, however, no evidence, beyond the representations of Lee and Owens, that these specimens of steel were made at Melrose, or, if made there, that they were made by the process alleged

33

to have been discovered by Lee, nor that, if so made, that the process was cheap, or resulted in the manufacture of a superior quality of steel. It cannot be said that these representations were evidence of the fact stated in the findings under consideration, or that it in a legal sense conflicts with the testimony of Noble, that the formula shown by the caveat filed by Lee would not produce steel.

It may be added, however, that Owens, in a conversation with the witness Cousins, after this suit was brought, said that he did not know that Dr. Lee had ever made that steel; that he never saw him make it; that Dr. Lee might have bought it, or got it from some other source. The witness further said he referred to the steel that was exhibited by Lee and Owens to induce stockholders to subscribe for stock. There was some metal that was called "steel" by Dr. Lee and others, made at Martinez, and which was also referred to by the appellant in a letter to Mrs. Paddock, put in evidence by respondent; but upon examination it will be found that all the statements or expressions, in regard to the manufacture of steel at that place, were simply repetitions of Lee's statements; while the witness Williamson, an iron founder and machinist of thirty-five years' experience, and who was employed by Dr. Lee about the 1st of June, 1884, at the works in Martinez, and who cast the battery shoes represented to be of steel, testified as follows: "I went there some time after Mr. Owens left, and after this lady [Mrs. Kelley] bought her stock. I think that was about the beginning of June. From that time I remained there in charge of the works up to the time that Dr. Lee left. During the time I was there, there was not any steel made at those works. Dr. Lee claimed these stamps and dies that I have spoken of to be steel, and he claimed that it was produced by the use of his chemicals. He either put in the chemicals himself or had someone else. . . . . On one heat there was none put in, as I said before. That was the heat I ran, which was the last one. While I was there I urged Dr. Lee to make steel." Again the witness said: "From my observation of Dr. Lee during the time while I was there, as an expert I say that he didn't manifest any knowledge of working that iron and steel. . . . . I did not see any evidence or any trace of any new process of manufacturing steel during the time I was there. . . . . The doctor professed to be making

steel out of the cupola, and made what he termed to be steel, but I could see no steel about it. . . . . I tested it by heating it and trying to work it, and I pronounced it as not steel, . . . . if it has got to be a direct answer." Mr. Bunker, another witness, testified that he urged Dr. Lee to make some of his fine steel, to which the doctor replied that he would not till he got ready. It may also be added that some time in August, 1884, Dr. Lee abandoned the enterprise, as it appeared, and, so far as the record shows, was never heard of by those interested afterward. Counsel for respondents do not contend that Lee did discover such process, but say that the evidence upon this point was not deemed satisfactory by the court, and it therefore prefaced the findings by the statement that the allegation that Lee was not the discoverer of such new method, etc., "is not sustained by the evidence, and the court therefore finds," etc. The only comment made by respondents' counsel upon this finding is "that the testimony is such as would not ordinarily produce material [moral?] certainty or conviction in an unprejudiced mind." It is true the burden was on appellant of proving her negative allegation, that being the foundation of her action. The degree of proof of a negative allegation is seldom measured by that required of an affirmative allegation. In some cases a negative may be positively and conclusively proved, and in such cases the general rule laid down in section 1869, Code of Civil Procedure, must be complied with; but in many cases this is impossible, and hence the amount of proof required to support the negative proposition and to shift the burden will vary according to the circumstances of the case; and very slight evidence will often be sufficient to shift the burden to the party having the greatest opportunities of knowledge concerning the fact to be inquired into: Steph. Dig., art. 96; United States v. Southern Colorado Coal etc. Co., 18 Fed. 273, 5 McCrary, 563.

It is perfectly clear that appellant made all the proof of her negative allegation that the nature of the case and the rules of evidence required. The witness Noble, whose learning and experience qualified him to testify as an expert, and whose competency was not questioned, testified that the method or process given in the caveat would not produce steel. That, without anything more, was quite sufficient to shift the

burden of proof to the other side. If it had been met by the testimony of another expert that it was a new method, and would produce steel profitably, there would have been a material conflict in the testimony; or if it had been shown that Lee's process had, by actual test, shown that steel could be produced by it of a superior quality, cheaply and profitably, and that the method was new, the great preponderance of the evidence would have been with respondents; and that evidence they were bound to produce, if it existed. Appellant, however, did not rest upon that, as she might have done, but proved by Williamson, who was in charge of the works at Martinez under Lee, that what Dr. Lee called steel, made by his process, was not steel. The bars of steel exhibited and tested at Martinez, and which were represented by Lee and Owens to have been made by this process at Melrose, were not proved to have been so made, and therefore raised no conflict in the evidence.

As to the finding that these representations which were made by Owens to the plaintiff were made only upon his belief, little need be said. Appellant testified positively that Owens' statements were made positively and repeatedly; that he exhibited to her specimens of steel which he asserted were made by Lee by his new method. About the same time, and before, as well as after, he made the same statements to Cousins, Barry, Bunker and others. But it is claimed on behalf of respondents that appellant's testimony is contradicted by Mrs. Paddock, who was present at the first conversation between appellant and Owens. That conversation was at Mrs. Paddock's house, early in April, when Mrs. Paddock was trying to sell to appellant 200 shares of the stock in this corporation, and had called in Mr. Owens and introduced him to appellant as one "who knew all about it." It is not necessary to discuss the want of probability, under all the circumstances, of Mrs. Paddock's statement that Owens said he "believed Lee had invented the process and had made the steel which he exhibited, inasmuch as that was a different transaction, not involved in this suit. Appellant bought Mrs. Paddock's shares in April, and afterward, in June, exchanged her farm for the stock owned by Owens. It is conceded by respondents' counsel that, after appellant purchased Mrs. Paddock's stock, Mr. Owens may have changed the form of

his representations from "belief" to that of an absolute fact, when he came to negotiate a sale of his own stock. If it be true that he did, the former representation can have no weight. Appellant's testimony shows that Owens called upon her many times after her purchase of Mrs. Paddock's stock, and made these representations as statements of fact, and urged her to visit Martinez and see the works, and there showed her specimens of steel, which he declared in Lee's presence was made by Lee by his process, and "that is our make of steel," and made other expressions of like character, and also informed her that he had the formula of Dr. Lee, but did not know that he could make the steel himself without experiment; all which statements and occurrences, subsequent to the first conversation at Mrs. Paddock's, are wholly uncontradicted. It is true that at the time she gave her testimony Mr. Owens was dead, and could not, therefore, contradict her. That fact should require the court to scrutinize her testimony, but could not authorize such distrust of it, if otherwise reasonable and probable, as to seriously diminish its weight. The same positive statements were made to others before, and at about the same time, in reference to the same facts, and while inducing others to take stock in the corporation. This testimony, counsel for respondents contend, was irrelevant, and, even if admitted by the court below without objection, should not be considered here. The cases cited by respondents' counsel are not in point; with one exception these were criminal cases, and the evidence held irrelevant was of other, distinct offenses, of the same character. In criminal cases, where the knowledge of the defendant is an essential ingredient of the offense, other offenses of the same character may be shown, as, for example, where the offense charged was that of passing a counterfeit bill, it is competent, for the purpose of showing that the defendant knew it was counterfeit, that about the same time he passed other counterfeit bills of like character, which were known to him to be counterfeit. Cases of fraud are, however, exceptions to the general rule. In Lincoln v. Claflin, 7 Wall. (U. S.) 138, 19 L. Ed. 106, the court said: "On the trial declarations of the defendants were received, which related, not merely to the transaction which is the subject of inquiry in this action, but to similar contemporaneous transactions with other parties. The evidence was not in-

competent or irrelevant, as contended by counsel. Where fraud in the purchase or sale of property is in issue, evidence of other frauds of like character, committed by the same parties, at or near the same time, is admissible'': See, also, Cary v. Hotaling, 1 Hill (N. Y.), 311, 37 Am. Dec. 323.

The only other finding necessary to be noticed is the fifteenth, viz.: ''That said plaintiff did not rely upon said representations, nor upon any thereof, in making said contract or deed, nor was she by said representations, or any thereof, induced to make said contract or deed.'' Appellant, after testifying fully to the representations made to her by Owens, testified that she had never been engaged in the business of manufacturing steel or iron of any kind; that she knew nothing about it further than had been represented to her by Mr. Owens; that she believed his representations, and relied and acted upon them in making the transfer of the land to him. It is not necessary that we should repeat these representations. The only testimony in the case tending to show that appellant did not rely upon the representations made to her by Owens was the testimony of Mr. James F. Stewart, an attorney, whose son, also an attorney, occupying the same office with his father, drew up the contract between appellant and Owens. Mr. Stewart testified that while the contract was being drawn Mr. Owens left the office, and he took occasion to ask appellant if she knew the facts connected with the matter, and she replied that she did; that she had informed herself fully; that she had received her information from parties at Martinez; that she was competent to make the agreement; and that she got her information outside of Owens. The uncontradicted evidence in the case, however, shows that up to the time this agreement was entered into no one at Martinez, except Dr. Lee and Owens, knew anything about the matter, except from the representations of those two men; and further shows that others could not have known anything about the alleged process otherwise. Therefore the invitations of Owens, repeatedly given to appellant, to go to Martinez and investigate, was an invitation to hear from others the representations he had made them, and in so doing simply repeated to her the representations he had made to her before, but in such manner as to greatly strengthen her confidence in him. While, therefore, to Mr. Stewart, who

knew nothing of the situation at Martinez, it might appear that appellant had fully investigated the subject, and did not rely solely or principally on Mr. Owens' statements, in the light of the record, his testimony does not raise a material conflict. My conclusion, therefore, is that the findings referred to are not justified by the evidence. The testimony of Mr. Stewart should have been excluded, and the court erred in receiving it, in the light of the circumstances shown by the record; but whether the appellant was prejudiced thereby to such extent as to justify a reversal upon that ground alone it is not necessary to decide.

Respondents' counsel have argued at considerable length that appellant's complaint does not state facts sufficient to support a judgment in her favor, and contend that for that reason the order denying a new trial should be affirmed, regardless of error. In this case there was no appeal from the judgment, and it is well settled that the sufficiency of the pleadings cannot be considered on appeal from an order denying a new trial: Brison v. Brison, 90 Cal. 323, 27 Pac. 186, and cases there cited. I think the order should be reversed and new trial granted, with leave to the plaintiff to amend her complaint if she desires, and so advise.

We concur: Vanclief, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion the order appealed from is reversed and new trial granted, with leave to the plaintiff to amend her complaint if she desires.

### ON REHEARING.

### September 2, 1892.

PER CURIAM.—The petition for rehearing is denied, but the following paragraph is eliminated from the opinion:

"The testimony of Mr. Stewart should have been excluded; and the court erred in receiving it in the light of the circumstances shown in the record; but whether the appellant was prejudiced thereby to such an extent as to justify a reversal upon that ground alone, it is not necessary to decide."