THE KNICKERBOCKER TRUST COMPANY

*v.*

THE PENN CORDAGE COMPANY et al.

[Filed November 14th, 1901.]

1. A mortgage, executed both as a real estate and a chattel mortgage, was recorded only as a real estate mortgage. The mortgagee took no possession of the chattels. On foreclosure of the mortgage it will, as against the creditors of the mortgagor, be held to be void as a chattel mortgage, and to be forceful only upon the portion of the mortgaged premises which is real estate.

2. Whether machines, &c., brought upon the mortgaged premises have, by the acts of the mortgagor, been converted into and become part of the real estate, depends upon three points: (1) actual annexation of some sort; (2) application to the uses to which that part of the realty which they are annexed has been appropriated; (3) that they were annexed with the intention that they should become a permanent accession to the freehold. Each case must be determined accordingly, as the facts proven show the existence of all these conditions.

3. Although the proofs may show that the machines were adapted to the uses of that portion of the realty where they were placed, yet if they fail also to show actual annexation, and an intention permanently to annex them to the freehold, their conversion into real estate will not be declared.

4. Where the machines came upon the premises as completed articles of merchandise, are fastened to the floors by adjustable attachments for the purpose of keeping them from displacement while in use by the application of the power, are in no way built or incorporated into the real estate, can be removed without injury either to themselves or to the building in which they are located, they will be held to remain personal property.

---

The bill in this case is filed to foreclose a mortgage, made by the defendant the Penn Cordage Company, a corporation of the State of New Jersey, to the Knickerbocker Trust Company, a corporation of the State of New York, to secure the payment of numerous bonds of the cordage company, amounting, in all, to $100,000, with interest, &c.

The complainant mortgagee, the Knickerbocker Trust Company, makes defendants the mortgagor, the Penn Cordage Com-

pany; Thomas E. Shields, receiver of the Penn Cordage Company —appointed in an insolvency suit, *sub nom. Reilly* v. *Penn Cordage Co.,* in this court—and also Alexander Simpson and others, who claim to be holders of, or interested in, a second mortgage made by the Penn Cordage Company to one Constantine P. Ralli, and also the Pennsylvania Railroad Company, in respect to a judgment recovered by it against the Penn Cordage Company, and Claud S. Fries, in respect to a judgment recovered by him against the Penn Cordage Company.

· The complainant, in its bill, sets forth a description of the mortgaged premises, which consists of fifteen acres and twenty-two hundredths of an acre of land, situate at Beverly, in the county of Burlington. The bill states that the mortgage contains the following clause:

. "Together with all the improvements thereon, or that thereafter might be erected thereon, and together with the franchises of the said the Penn Cordage Company, and all its income whatsoever, and all the goods, chattels and personal property then in the possession of the said Penn Cordage Company, in, of and about the said described premises in the town of Beverly, in the county of Burlington and State of New Jersey, and all the property, real, personal and mixed, now owned by the Penn Cordage Company, and also all the goods, chattels and personal property that may hereafter be acquired by said Penn Cordage Company."

The bill sets forth the execution of the complainant's mortgage, with the formalities incident to both a real estate and a chattel mortgage, and alleges that it was recorded in the office of the clerk of Burlington county on the 10th day of April, 1896.

The entire series of bonds secured by the complainant's mortgage, amounting, in all, to $100,000, has been issued, and they are all now outstanding and unpaid, with considerable accumulations of interest, and, by reason of these defaults in the payment of interest and of other defaults, set forth in the bill, the principal-money of the mortgage has come to be due and payable, and the holders of the bonds, in accordance with the terms of the mortgage, have requested the complainant to foreclose it.

The bill of complaint sets forth the making of a second mortgage to one Constantine P. Ralli, for the sum of $50,000, dated October 4th, 1897, and recorded in Burlington county clerk's

Knickerbocker Trust Co. *v.* Penn Cordage Co.

office, and subsequently assigned to the Guarantors Finance Company, which company, having become insolvent, Alexander Simpson and others were appointed receivers thereof. The bill alleges that the Guarantors Finance Company assigned the last-mentioned mortgage for $50,000 to the People's Bank of Philadelphia, a corporation which has also been adjudged insolvent, and whereof Thomas W. Barlow has been appointed receiver. The receivers of each of the above-named corporations are made defendants, in respect to their several interests in the last-named mortgage. Several judgment creditors of the Penn Cordage Company are also made defendants.

The prayer of the bill is for the foreclosure and sale of the mortgaged premises, including the personal property described in the mortgage, or covered by the general provisions of the same, or, if it be deemed more equitable and just, that the mortgaged premises, with the appurtenances, may be sold.

Thomas E. Shields, the receiver of the defendant the Penn Cordage Company, answers the bill of complaint, substantially admitting the execution of the complainant's mortgage as alleged in the bill, so far as it is a real estate mortgage, but charging that it was not executed in accordance with the statutes of this state regulating the execution of chattel mortgages, and was not recorded as a chattel mortgage, and does not cover any of the personal property which the Penn Cordage Company then owned or which it afterwards acquired, and the receiver claims that the personal property of the Penn Cordage Company vested in him as receiver of that company, free and clear of the lien of the complainant's mortgage.

Mr. Shields, the receiver, in his answer, makes the same allegation with relation to the mortgage made by the Penn Cordage Company to Constantine P. Ralli, and also charges that the latter mortgage is entirely void for want of consideration. He alleges that the receivers of the Guarantors Finance Company and the receiver of the People's Bank, who had come by assignment to be interested in the Ralli mortgage, had filed their claim under it with the receiver in the insolvency suit of *Reilly* v. *Penn Cordage Company;* that their claims were disallowed by the receiver; that appeals from the disallowance have been taken

which are yet unheard, and he claims that the disallowance stands unreversed, and the said mortgage and bond accompanying the same are invalid. The defendant Shields further alleges his appointment as receiver of the Penn Cordage Company on December 7th, 1897, and that a number of the defendants named in the complainant's bill in this case as judgment creditors recovered their judgments after his appointment, and he insists that no judgment against the Penn Cordage Company is forceful against his title as receiver of that company, to have its personal property, unless execution had been issued under such judgment and actually levied against such personal property prior to the appointment of said receiver. The receiver further sets forth his inventory of such property of the Penn Cordage Company as he has determined was personal property, reciting in his answer schedules of the same by separate articles. He alleges that he notified the complainant and all the judgment and other creditors of his said determination, and that no one has appealed therefrom and that his said determination stands unreversed, and cannot now be questioned in these proceedings. He suggests that no disposition of the property covered by the complainant's mortgage can be made without fixing the nature and extent of each of the liens thereon, and he prays that such ascertainment may be made and that his determination of the question which of said property is realty and which personalty, no appeal having been taken therefrom, may be affirmed, and that the possession of the personalty may be awarded to him subject to such lawful liens as have been created thereon.

The Pennsylvania Railroad Company, a judgment creditor, by its answer disputes the validity of the complainant's mortgage, and also of the mortgage originally made to Ralli, as encumbrances upon the personal property of the Penn Cordage Company, and charges that neither was recorded as a chattel mortgage as required by the Chattel Mortgage act of this state. It alleges that it had obtained a levy on execution issued upon its judgment against the personal property of the Penn Cordage Company, on the 1st day of December, 1897, and that its lien thus obtained is the third lien upon the personal property of the Penn Cordage Company.

The defendant Claud S. Fries also answers, and charges that neither the mortgage of the complainant nor the Ralli mortgage was recorded as a chattel mortgage, and insists that his claim is a first lien upon the personal property of the Penn Cordage Company, because of a levy made thereunder, on the 12th day of October, 1897, prior to the two mortgages and to the judgments set out in the complainant's bill. He also contends that neither the complainant's nor the Ralli mortgage complies with the requirements of the Chattel Mortgage act.

The defendants Alexander Simpson, Jr., and others, receivers of the Guarantors Finance Company, and Thomas W. Barlow, receiver of the People's Bank, representing their respective interest in the Ralli mortgage, also answer. They insist that the Ralli mortgage was made upon good and lawful consideration, and that it is a lien upon the lands, premises, goods and chattels and personal property described in the complainant's bill, and they ask that the amount due on their said mortgage may be paid to them.

Issue was joined on these answers, and the cause was brought to a hearing on evidence.

At the hearing defaults by the Penn Cordage Company in performance of the conditions of the complainant's mortgage, and the proper exercise of the election whereby the principal of that mortgage came to be due, were admitted by the defendants. It was also agreed that Receiver Shields' petition in the case of *Reilly* v. *Penn Cordage Company,* asking for an ascertainment and classification of the mortgaged property as realty or personalty, and the testimony taken thereon, should be submitted in this cause as evidence. The answer of the Knickerbocker Trust Company in the suit of *Reilly* v. *Penn Cordage Company* was also admitted in evidence, without dispute. A copy of notice is produced, signed and served in that case by counsel for complainant in this cause, in which the complainant specifies the items of property which he claims are permanent fixtures, "constituting part of the soil, and, as such, subject to mortgages on real estate." This was admitted by agreement.

The counsel for the complainant admitted that the complainant's mortgage was not recorded as a chattel mortgage. Counsel

for defendants admitted that the complainant's mortgage, in its present condition, was received by the county clerk at the time mentioned in his certificate, but that the clerk caused it to be recorded only as a real estate mortgage, and not as a chattel mortgage.

Counsel for the complainant and for the several parties judgment creditors, mentioned in the amended bill, also agreed that the several judgments were recovered, executions issued thereon, and levied upon the property mentioned in the schedule of the receiver as the personalty of the Penn Cordage Company.

*Mr. Eugene Stevenson,* for the complainant.

*Mr. James E. Howell,* for the defendant Receiver Shields.

*Mr. F. Morse Archer,* for the defendants Receivers Beeber and Detwiler and for the defendant Receiver Barlow.

*Mr. Charles V. D. Joline,* for the defendant Claud S. Fries.

*Mr. Joseph H. Gaskill,* for the defendant the Pennsylvania Railroad Company.

GREY, V. C.

The mortgage of the Penn Cordage Company to the Knickerbocker Trust Company, the complainant in this cause, securing the payment of $100,000, though executed with the formality of a chattel mortgage, was not, in fact, recorded as a chattel mortgage.

It was conceded at the hearing that the complainant's mortgage, because not recorded as directed by the Chattel Mortgage act, was ineffectual as a chattel mortgage against the claim of the creditors of the Penn Cordage Company, mortgagor. No argument was advanced by the complainant asserting any validity in the mortgage as a chattel mortgage. As against the claims of the judgment creditors and of the receiver of the Penn Cordage Company, representing the creditors of that company, the complainant's mortgage must be held to be invalid as a chattel mortgage.

The mortgage made by the Penn Cordage Company to Constantine P. Ralli, dated October 4th, 1897, purporting to secure the payment of $50,000, also fails of efficiency as a chattel mortgage. Though expressed, in terms, to be a lien upon the personal property of the mortgagor company, no affidavit of the mortgagee, stating the consideration of the mortgage, or the amount due or to grow due thereon, is annexed to it, nor has it been recorded as a chattel mortgage, as directed by the statute. No claim or argument was made by the holders of this mortgage, defendants in the cause, asserting its validity as a chattel mortgage.

The complainant's mortgage being solely a real estate mortgage, this suit to foreclose it must be considered as a real estate foreclosure, and only those issues can be considered which are pertinent to the foreclosure of a mortgage upon land.

The only contested point in the cause arises from the dispute between the complainant and the defendants as to what portions of the equipment, machinery, tools and appliances of the Penn Cordage Company are real estate, and, as such, subject to the lien of the complainant's mortgage, and what portions are personal property, and, as such, free from that lien. All the evidence offered and all the arguments presented have been addressed to the establishment or refutation of the conflicting claims of the complainant or defendants on this one question.

Elaborate proofs were taken in the case of *Reilly* v. *Penn Cordage Company* on this point. They have been accepted by consent as evidence in this cause, and some additional expert testimony has been presented on the hearing. The petition of the receiver in the *Reilly* v. *Penn Cordage Case* (accepted by consent as evidence in this cause) shows that the receiver in that case determined that certain articles named in schedules annexed to the petition were personal property. The complainant, by notice, claimed that certain articles which the receiver has classified as personalty are, in fact, real estate. The receiver's schedules have since by agreement of the parties been corrected and certain articles named therein as personal have been admitted to be real estate. But there still remain certain other machines declared by the receiver, or the other defendants, to be personal property, which are claimed by the complainant to be realty and

to be subject to sale on this foreclosure. The present inquiry is directed, in the first instance, to the ascertainment of the character of these disputed articles.

The Penn Cordage Company's property is located in Beverly township, in Burlington county, and lies on the southerly side of the railroad which runs from Camden to Trenton. It consists of eleven buildings, some of brick, some of frame, in which the machinery and articles in dispute and the other equipment of the factory are placed. The larger structures are the three-story brick building, where most of the machines are located; the boiler, engine and repair shop; the rope-walks, the tar-house, the office, wareroom, stables, shedding, &c.

The testimony shows that while these buildings are immediately usable for their present purpose, a cordage works, they are readily adaptable for many other kinds of manufacture. The only buildings peculiarly devoted to the manufacture of cordage, &c., are the rope-walks. A rope-walk is a long, low shed with tracks running its entire length, carrying the machinery which makes the rope, the motive power being supplied from one end. The change of so peculiar a structure from the original use for which it was constructed, would be a sacrifice of some of its value. The testimony shows that the end nearest the other buildings could be advantageously used as a storehouse.

The products of the works are rope and binder twine, the latter of the kind used by the harvesting machines in the grain fields.

The following is a list of the machines which the complainant insists are real estate—describing them in its notice as "constituting part of the soil and as such subject to said mortgages on real estate"—and which the receiver, or other defendants, contend must be held to be personal property, with a summary of the evidence descriptive of the disputed articles, their use, their relation to the land and their character as realty or personalty:

The scutcher. This is a machine used to clean hemp. It is constructed of wood with iron and steel posts, weighs probably one thousand two hundred to one thousand five hundred pounds, is not built into the building in any way. It sits upon and is fastened to the floor by four lag screws and is run by an overhead

belting connection with the shafting. It might be used in any other cordage mill, and was, in fact, brought to Beverly from another mill in Brooklyn, where it had previously been run. It has no special adaption for use at the Penn cordage factory. By the testimony it appears to be doubtful if this machine is essentially necessary for use in a cordage plant.

The lapper. This is a machine having a cylinder with fine teeth on it, into which short hemp is fed, which it rolls up into what is called a lap or bundle. It is constructed of wood and iron, weighs about one thousand five hundred pounds, is fastened to the floor by screws and run by overhead belt connection with the shafting. Either such a machine or one doing like work is essential to a cordage works. It is, however, usable in any cordage works and, in fact, came from the Brooklyn mill, where it had previously been used. It can be removed and set up elsewhere without injury to the building or the machine, and appears to be an article of manufacture and sale in quantities.

The breaker. This is the first machine that most of the hemp is put through, it "breaks it out." It is made of iron, and is a long and heavy machine. It probably weighs a couple of tons. It is fastened to the floor by eight lag screws, and is run by a belt and overhead shafting. The fastening to the floor is for the purpose of preventing it from jarring out of its place and to keep the tight belt from lifting it from the floor. In short, to keep it stationary while in use. The machine is similar to others of like nature used in other cordage factories, is not especially adapted to the Penn cordage factory, and could be removed without injury either to itself or to the factory.

The coarse spreaders. These machines are similar to the breakers, except that they are lighter and finer. Each machine will weigh something over a ton. They are fastened to the floor with screws and operated by overhead belting. They are very essential to any complete cordage plant and are used in all cordage factories. The machines in question were not especially constructed for the Penn cordage factory, do not differ in their construction from ordinary machines of similar character and can be removed without damage to the machine or to the building in which it is placed. The fixing to the floor is shown to be for

the purpose of preventing the motion of the power from jarring the machine out of line so that the belts would not run. The vibration of the machine and of the building itself would have this effect, unless it was fastened to the floor.

Four fine spreaders. These machines are described by the expert as identical with the coarse spreaders, except that the pins of the fine spreaders are finer, smaller and nearer together. They have the same characteristics of use and annexation to the building as the coarse spreader.

Two drawing frames. These are used for combing hemp. They weigh about a ton and a half. Like the others, they are fastened to the floor by lag screws and operate by a belt from overhead shafting. They are an essential part of every cordage plant. They came as finished machines from the place where they were ordered, and may be removed from the factory without injury to the machine or the buildings. They are fastened to the floor for the purpose of keeping them steady.

Eight finishers. Five of these machines are on the third floor and two on the second floor of building No. 1, and one on the second story of building No. 3. They are used for drawing in hemp, and are sometimes called "finishing frames," because they are the last frames through which the hemp goes. They are made of iron and steel, each weighing about a ton and a half. They are essential to every cordage plant though usable to some extent for other purposes. These particular machines are not especially adapted to the Penn cordage works, are finished for use anywhere. Fastened to the floor in order to steady them in their places to prevent them from jarring.

Forty-two double jennys. These are spinning machines used to spin yarn. They are made of iron and steel, operated by belts from overhead shafting, most of them are fastened to the floor, with a lag screw, and weigh about a ton each. They are not especially adapted to the Penn cordage works, were brought upon the premises as finished machines, are movable and fastened to the floor to avoid jarring and displacement.

Single and double twisters. There are nine of these machines, which are used for twisting the yarn together into rope and strands. There are two kinds, single machines and double ma-

chines. The single ones weigh about one thousand two hundred pounds, and the double ones probably a ton. Such of them as are fastened to the floor are attached by lag screws. Some of them are not fastened at all. All of them are movable, were brought upon the premises as finished machines, and may be removed without injury to the building or machines, and used in any cordage factory. Every cordage plant has them.

Marline machines. These machines are similar to the twister, except that they have an additional turn. They are used in every cordage plant which goes into marline making. They are brought upon the premises as finished machines, can be taken out without injury to the building or to the machine and used elsewhere, and are fastened to the floor to prevent displacement.

Houseline machines. They are similar to the marline machines, except that they have three bobbins in the rear instead of two. Each weighs about one thousand two hundred pounds. They are fastened to the floor with lag screws to keep them steady, are found in every cordage works, can be removed to any other building without injury to the building or machine. They came upon the premises as complete machines, are not especially adapted to the Penn cordage works.

The expert testified that in the use of the machines at the Penn cordage works, although, as a rule, they remained in their places, yet they are frequently changed about. If twine were being made, the twisters would be removed and the ballers put in, and if rope, the twisters would be put in and the ballers removed.

Ballers. There are ten of these. They are iron machines, used for putting the twine into balls, such as are used in reaping machines. Each machine weighs about a thousand pounds. They are necessary in any cordage factory which makes binder twine. They came upon the premises as complete machines, are fastened to the floor to prevent displacement, are not especially adapted to the Penn cordage works, could be taken out and used anywhere in any other cordage works.

Strapping reel bars. These are iron bars, upon posts, with pulley and belt to revolve the bar so as to coil up rope. Two of these posts were specially put up. They could, however, be taken

down and out of the building, and this would not injure the coil arrangement for use elsewhere.

Rope machines. These are used to make small rope, from six threads up to twenty-four threads. The twenty-four-thread machines weigh from a ton to a ton and a half. The twelve-thread machines weigh about a ton and the six-thread machines somewhat less. They are fastened to the floor and run by belting, and are necessary parts of any cordage plant which makes small rope. They came upon the premises as finished machines, were not especially built for the Penn Cordage Company, could be taken away without injury either to the building or to the machine, and are usable in any other cordage factory. The particular machines in question were, in fact, second-hand machines—most of them—and had been used elsewhere before they were brought to Beverly. In their use they had been moved from place to place in readjusting the factory.

Boone layers. There are two of these machines, and are used for the purpose of putting the twist into rope. The double one weighs about three thousand pounds and the single one about two thousand pounds. They are fastened to the floor to steady them. Can be moved without injury to the building or machine, and are usable in any other cordage factory making the same product.

One former. This machine is used to twist the yarn into strands. It weighs about four hundred pounds, is a movable machine, usable in any cordage factory. Though essential to such a factory, was not especially built for the Penn cordage works. Could be taken out without damage.

The above-described machines are located in building No. 1 (except as mentioned), with reference to their convenient use with relation to the amount of power there required. They constitute, as a whole, what the parties using them deem to be the most convenient arrangement of the conduct of their business.

In building No. 2 there are only two lathes, two drills, one shaper, one grindstone, one oil pump and one emery grinder. Except the oil pump, used for oiling hemp, the whole building and its equipment make up a machine shop for repairing purposes. The tools—most of them—are screwed to the floor. They are useful for the keeping of the machines of the factory in order.

Picker. This is a large cylinder of pointed teeth. It revolves and the fibre of material is fed into it and the machine picks it apart. It is used to tear old rope and old, and sometimes good, stock into shreds. It weighs about a ton and more. It is usable, not only in cordage plants, but for the other purposes outside of cordage in concerns which use pickers. It was brought to the Penn Cordage Company a complete machine, and is capable of removal without injury to the machine or the buildings. It is fastened to the floor to prevent displacement.

Porgy spinner. This machine is used to twist up short waste material into strands. It weighs something less than a ton. The particular machine in question was not especially constructed for the Penn Cordage Company, and is capable of use in similar manufacturing establishments, and is fastened to the floor to steady it while in motion.

Jacks. There are eight forming and laying jacks on the premises. They are the machinery in the rope-walk. They are run on tracks, up and down the walk, and are driven by an endless band and are taken along the floor by a windlass. The forming jacks travel from one end of the floor to the other, going down with the rope and coming back to get another lot. The laying jack, the lower one, is on wheels and movable, but, as a general thing, is tied fast to a post. The jacks on the new rope-walk are laid on rails of yellow pine timber, which are nailed to the floor. In the old rope-walk the tracks are light iron T rails, laid on the floor. The jacks themselves are movable, run back and forth on the rails, and form the yarn into strands. They are used only in rope-walks, are somewhat of the nature of small railroad cars, and are built of a certain width adapted to the tracks.

Reeling machines. These machines operate by separate gears, and are used to wind the rope into coils. The smaller ones weigh six hundred pounds and the larger one thousand five hundred. The frames of two of them are fastened to the floor. The third is on a track, with iron wheels. It runs up and down the tracks, operated by an endless band. These machines were complete when brought on the premises, are usable in any cordage plant, and not especially adapted to the Penn cordage buildings,

but might be used in any rope-walk, and are removable without injury to the building or the machines.

Strapping reel band. This is a small stand about eighteen inches square on the floor, standing about two feet and a half high, and contains a reel, used for reeling up small coils of rope, and is driven by shafting overhead. It is a small machine, screwed to the floor. It can be used in any cordage plant.

Yarn testing reel. This is a machine used to bind yarn upon or measure the length into pounds. The axle of the reel is horizontal, fastened to two wooden posts screwed to the floor.

Belt driver. This is an appliance at the top of an endless belt that runs from the first to the second floor of the new rope-walk, and is used to send bobbins and material down from the second to the first floor. It is in the nature of an elevator. It is adjustable and usable anywhere for a like service.

Reversing reel. This is a machine used in reversing the yarn from the outside ends of one bobbin to the inside of another. It could be used elsewhere as part of any cordage plant, and is fastened to the floor to keep it steady.

Porgy jenny. This is a second-hand machine, which is on storage in building No. 6, has been there for three years, and has never been set up. It does not appear to have been in any way connected with the realty.

Belting. At the hearing the belting was admitted to be a part of the realty, but, as the examination proceeded, the judgment creditors insisted that a portion of the belting, which related to particular machines, was not part of the realty, but was personalty. The expert testified that all belting below six inches in width was used to drive down to the machines, while that from six inches up drives from the shafting.

Bobbin reel. This is like a large spool, and hangs from the ceiling.

Large platform scale. This is a large Fairbank's platform scale, set in a pit. Its weighing capacity is three thousand six hundred pounds. There is an excavation within which the weighing machinery is set. This is walled in by stone or brick, and is immovable. The first floor of the building is recessed out so that the platform of the scale comes flush with its floor.

Tanks and kettles. These are in building No. 4, used for a tar-house, in which tar is heated in these large kettles by a steam pipe. The rope and yarn are then run through the melted tar. There is one tar tank, one tallow tank and large and small kettles. The large tar kettle is heated by steam pipes which run around it. The small tar kettle is heated by steam-pipe connections. The tar tank is built of wood, is copper lined and has steam-pipe connections. These steam-pipe connections carry steam from the boiler. The larger tar kettle was built with the tar-house, and appears to be a part of it, and it is proven would be injured by taking it out.

Windlasses. Two of these are used for hoisting up rope out of the tanks.

Reel flyers. These appear to be parts of machines which have been laid aside.

Platform scale. This is an ordinary platform scale on wheels, movable from place to place.

Some additional evidence has been offered by the complainant, going to show that the machinery in question, taken as a whole, is adaptable and usable solely for the purpose of the rope and cordage business; that the buildings have been adjusted for the use of such machinery; that the permanent shafting has been put in with special reference to the use of cordage machinery, and that the removal of that machinery would make it comparatively useless. The complainant also recalled the expert who testified as to the character of the machinery, and naming over the list of the disputed articles to him, asked his opinion, whether they were more valuable when sold in connection with the building where they are than when sold to be removed. The expert was of opinion that they would be more valuable if sold as they were located in the building, ready to run, for the reason that it would cost something to take them out and move them away and place them in another building. The complainant further sought to show that there was a liability to additional loss from the disruption of the cordage works, and from the improbability that a purchaser would want to buy if he could not at once proceed to work the factory. The expert was of opinion that any purchaser who might want the property as a cordage works would

want everything that was upon it, the equipment with the buildings, though he admitted that there was a likelihood of more bidders for certain portions of the machinery. Finally, the expert was of opinion that the real estate and buildings would not sell as advantageously without the machinery, &c., as with it.

The court of appeals has several times declared the principles which govern the conversion of personal property into realty, by incorporation into the freehold. One of the latest deliverances of that court is the case of *Feder* v. *Van Winkle, 8 Dick. Ch. Rep. 372.* The rules there laid down are that in order to establish the claim of the mortgagee to machinery against the receiver (of an insolvent corporation) it must appear:

*First.* That the chattels were actually annexed to the real estate or to something appurtenant thereto.

*Second.* That they were applied to the use or purpose to which that part of the realty with which they were connected was appropriated.

*Third.* That they were annexed with the intention to make a permanent accession to the freehold.

As to the actual annexation and intended incorporation of the machines in dispute in this case into the realty, so that they became part of the freehold, it may be said of all the machines above described, that the testimony shows that they came to the Penn cordage works as finished and completed articles of merchandise, ready, when they arrived, to perform their work when set up in place and connected with power. Some had previously been in use elsewhere. None of them were specially made for the Penn cordage works. None of them were incorporated into or became, by construction, a part of the buildings or real estate of the Penn Cordage Company. All were served with power, not by cog-wheels, which might indicate permanent placing of the machines, but by adjustable belting, which allowed their ready removal. The court of appeals in *Scheifele* v. *Schmitz, 15 Stew. Eq. 901,* recognized this distinction. The only evidence of actual annexation to the realty, besides their presence in the buildings, is the fact that the machines were fastened in place by lag screws. This is a screw with a nut head which may readily be turned by a wrench. This adjustable fastening held them to

the floors so that when in use they might not be jarred out of position by the motion of communicated power. None, even of the heavier and larger ones, were annexed in any permanent way to the buildings or real estate.

There is no evidence which indicates any intention that these machines should become either temporarily or permanently a part of the freehold. The Penn Cordage Company dealt with them as movable and adjustable tools, convenient for the conduct of its business. All are capable of removal and use in any other cordage works without injury to the Penn cordage buildings, or to the machines themselves. Many of the lighter machines were not only movable but were actually moved from one place in the factory to another, as the convenience of their use might require. When they made twine they removed the twisters and put in the ballers, and when they were making rope they took out the ballers and put in the twisters.

The counsel for complainant insists with much ingenuity that in view of the construction of the rope-walk buildings, their efficient use for rope-making purposes, and for no other, and the attendant construction of the other suitable buildings, the introduction upon the premises of machinery especially adapted to the manufacture of rope and cordage, must be considered as an annexation of the machines to the buildings specially constructed for that purpose. He insists that the evidence in the present case is much more forceful to show a conversion of the machines into realty than were the proofs in the case of *Feder* v. *Van Winkle,* and that the machines cannot be here held to be personalty without overruling that decision.

In the *Feder Case* the learned justice who delivered the opinion of the court of appeals put the decision upon the question whether there was an absence of the intention to incorporate the machinery with the real estate, as in *Blancke* v. *Rogers, 11 C. E. Gr. 565,* or the presence of such an intention, as in *Speiden* v. *Parker, 1 Dick. Ch. Rep. 292.* He reviews the evidence in the *Feder Case* as to the nature of the annexation of the various machines to the land, and holds that the chattels did not retain the character of personalty as in the *Blancke Case,* but were transmuted into realty and passed to the mortgagee as in the

*Speiden Case.* The learned justice found that the evidence in the *Feder Case* showed that "the various appliances were actually annexed to the freehold, they were fitted for and applied to the use to which the real estate was appropriated, all being designed for and necessary to the prosecution of a common purpose, thus the machinery and the land became fixed and incorporated as a whole."

To determine that there has been a conversion there must be evidence which shows an annexation of a character to indicate that there is a purpose to make the chattel a part of the realty. There was in the *Feder Case,* in the judgment of the court of appeals, sufficient proof to sustain this view. The character of the annexation to the land of the appliances in dispute in that case is related on page 375 of the report. It will be seen the annexation is so substantial and permanent as to be structural and incorporative of the machines into the realty.

In the present case, as to the machines, there is no such evidence. They were fixed in position, as the expert proved, by adjustable fastenings, to keep them from displacement by motion. They connected with the permanent shafting by adjustable belting. Many of them were, in fact, moved as the convenience of their use required. These facts bring these machines within the ruling in the *Blancke Case,* recognized in *Feder* v. *Van Winkle* to be the leading decision of its class.

The proofs in this case do show one of the elements necessary to support a conversion of chattels into realty. The machines were used for the same purposes to which the realty was appropriated. But this is not enough. All the essential incidents must co-exist in order to effect a conversion. In this case there is no sufficient showing either of an actual annexation of the machines or of an intention to make them part of the freehold. The principles declared and applied in the decisions of *Blancke* v. *Rogers, Scheifele* v. *Schmitz, ubi supra,* and *Penn Mutual Insurance Co.* v. *Semple, 11 Stew. Eq. 578,* must control this case.

There are, however, several articles in dispute, regarding which the evidence shows actual annexation to the freehold of a permanent character.

The large platform scale rests upon a stone or brick founda-

41

tion, built in the ground, and is immovable. The first floor of the building is recessed to hold it, and the platform of the scale is built to be flush with the floor. This annexation is structural and incorporative of the scale into the realty, and it thus becomes subject to the mortgage.

The tar tank and kettles are in the same class. The large one is built into the tar-house, and would be practically destroyed if removed. The smaller tar kettle and the tar tank are so fixed in the building that they are part of it, and are also connected with the realty by steam pipes leading from the boiler. The receiver concedes these to be realty, but the judgment creditors insist they are personalty. The tallow tank is within the same ruling. They are all part of the realty.

The movable platform scale on wheels is clearly unattached to the realty, and is personal property.

The belting usable in immediate connection with the individual machines which are held to be personalty, not usable without them, partakes of their nature, and is also personalty. This applies to the belting which the expert described as "all the belting below six inches, which drives down to the machines," and not to that "from six inches up, which drives from the shafts."

I have discussed the matters in dispute solely with reference to the evidence of a conversion of the machines in question into realty, and the consequent lien of the mortgages thereon. It may be proper to note that the mortgages do not refer to the thing mortgaged as a cordage factory or designate it in any other way as an entirety, whereof the land, the buildings, the machines and tools and equipment were component parts, all going to make what is known in business parlance as "a plant." The descriptions in no way indicate that the parties dealt with the things mortgaged as an entirety. The complainant's mortgage was executed by the Penn Cordage Company, not only as a real estate mortgage, but also as a chattel mortgage, showing that the mortgagor did not deal with its property as a single thing—an entirety—in making the mortgage. The land is described as land, the personalty as personalty. There is not even mention of the character of the business for which the property was used. Nor are machines or machinery named in the complainant's mortgage.

The complainant can maintain the lien of its mortgage on the machines only by showing that they have, by the acts of the parties and by operation of law, become real estate. In this it has failed. The doctrine declared in *Delaware, Lackawanna and Western Railroad Co.* v. *Oxford Iron Co., 9 Stew. Eq. 340,* does not apply to this case.

It is no reason to include the personalty within the lien of the mortgage, and the sale of the mortgaged premises (against the wishes of those interested in the personalty), because a possible purchaser of the works would pay more for both factory and machines, if they were sold at one bid than if sold separately. The complainant is entitled to a decree for the sale of the property included within the mortgage and to no more. If any accompanying disposition is to be made of the personalty, it can only be by consent of parties interested in the personalty or by a showing of an equitable right in the complainant, which has not been exhibited in this case.

This disposes of all the questions necessary to the ascertainment and enforcement of the complainant's rights. There are suggestions in the answers of equities claimed by the defendants as against each other, which, in the present state of the pleadings, cannot be determined in this foreclosure suit. The receiver claims that the Ralli mortgage held by the defendants, the receivers of the Guarantors company, and of the People's Bank, is absolutely void for want of consideration, &c. The answer which sets up this claim by one defendant against another is not framed as a cross-bill, nor has the mode of procedure required by the rules of this court in cases of cross-bills been followed. The Ralli mortgage is, as above shown, a lien only upon the real estate. The inferences to be drawn from the proofs indicate that it is very doubtful whether the purchase-money of the real estate will be sufficient to satisfy the complainant's mortgage. If it is insufficient, litigation between the defendants as to whether the Ralli mortgage is valid or not would be futile. The foreclosure sale of the premises ought not to be delayed to await the reformation of pleadings and the settlement of disputes between defendants which do not affect the complainant's right to relief, but which may seriously interfere with the enforcement of its

undoubtedly prior equity. The cross equities of the defendants may be adjusted after the sale in the disposal of the surplus money (if there shall be any) by a subsequent proceeding for that purpose.

A decree will be advised in accordance with the views above expressed.