### SHOOTERS ISLAND SHIPYARD CO v. STANDARD SHIPBUILDING CORPORATION et al.

### JAMES HOWDEN & CO., Limited, v. STANDARD SHIPBUILDING CORPORATION.

(Circuit Court of Appeals, Third Circuit. November 1, 1923.)

Nos. 3006, 3008.

1. **Landlord and tenant ⊛81(1)—Lessee has a mortgagable estate.**
Under the law of New Jersey a lessee of land under water, with an option to purchase, has an estate in the land which it may mortgage.

2. **Mortgages ⊛13, 131—Mortgage of after-acquired property is valid, and attaches only to interest acquired by mortgagor.**
A mortgage of after-acquired property is valid and enforceable in equity, but is subject to the qualification that it attaches only to the interest acquired by the mortgagor, and, if that interest is subject to prior liens, the mortgage is also subject to such liens.

3. **Liens ⊛7—Mortgages ⊛151(1)—Lender of money held not to acquire equitable lien on property purchased by borrower superior to existing mortgage.**
The Fleet Corporation advanced money to a shipbuilding company on contracts for the construction of ships, and to facilitate and expedite that construction it was authorized to be expended on the plant as well as on the ships themselves. No security was asked, and no agreement made for repayment; but some years later, on settlement, a mortgage was given the Fleet Corporation for a balance due. *Held,* that such advances did not give the Fleet Corporation an equitable lien on property acquired and improved by the shipbuilding company with the funds to the displacement of a pre-existing mortgage.

4. **Equity ⊛13—Enrichment at expense of another, which equity will not permit, must involve misconduct or fault as ground for relief.**
The doctrine that equity will not permit one person to be unjustly enriched by the expenditures of another presupposes some element of misconduct or fault in the transaction.

5. **Liens ⊛7—Equitable lien not raised by mere lending of money for purchase of property.**
An equitable lien is not raised by the mere lending of money for purchases and improvements that were understood and intended.

6. **Mortgages ⊛158—Mortgage not entitled to priority as purchase-money mortgage.**
A mortgage executed to secure advances made five years before and used by the mortgagor in the purchase of the property mortgaged, to have the effect of a purchase-money mortgage, with priority over intervening liens, must have been so intended from the time the advances were made, and the advances and execution of the mortgage must have been a part of the same continuous transaction.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. **United States ⟲124—As voluntary suitor is subject to general rules of law.**

Except in certain cases, as where the statute of limitation or laches is involved in a suit on a purely governmental matter, when the United States appears as a suitor, it voluntarily submits to the law, places itself on the same footing as other litigants, and is not entitled to remedies which cannot be granted to individuals.

8. **United States ⟲52½, New vol. 19A Key-No. Series—Fleet Corporation not entitled to immunities of sovereign in business transactions.**

The Emergency Fleet Corporation, in its business transactions as a distinct corporate entity, is bound to observe the law of the state in which it is doing business, and in such transactions it does not stand in the place of the government, so as to share the immunity of the sovereign.

9. **Receivers ⟲77(2)—Chattel mortgage to Fleet Corporation, not executed nor recorded as required by state law, held invalid.**

A chattel mortgage made to the Emergency Fleet Corporation on property in New Jersey, but which was not executed nor recorded as required by the laws of the state, *held* invalid as against receivers for the mortgagor.

10. **Chattel mortgages ⟲140—Invalid chattel mortgage cannot be given effect as purchase-money mortgage.**

A mortgage on personal property in New Jersey, invalid under the laws of the state for want of proper execution and recording, cannot be given effect as a purchase-money mortgage.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Creditor's suit by James Howden & Co., Limited, against the Standard Shipbuilding Corporation, in which receivers were appointed, consolidated with suits by the Shooters Island Shipyards Company and the United States Shipping Board Emergency Fleet Corporation against the same defendant for foreclosure of mortgages. From the decree, the Shooters Island Shipyard Company and James Howden & Co., Limited, separately appeal. Reversed.

William St. John Tozer and White & Case, all of New York City (Joseph M. Hartfield, Harvey C. McClintock, and Branch P. Kerfoot, all of New York City, of counsel), for appellants.

Walter G. Winne, U. S. Atty., of Hackensack, N. J. (Chauncey G. Parker, of Newark, N. J., Henry M. Ward, of New York City, and John M. Emery, of Newark, N. J., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This contest for priority between two mortgages turns on a claim to a prior lien in favor of the junior mortgage. In view of the number of grounds on which the claim is made and resisted, a careful statement of the facts may aid in understanding our decision.

In 1915, Shooters Island Shipyard Company sold its shipbuilding plant, situate on Shooters Island, in New York Bay, to the Standard Shipbuilding Corporation for $1,000,000 and took a purchase money mortgage on lands in the State of New York to secure $863,000, a part of the purchase price. Shooters Island was, and is, a single piece of property entirely occupied by the shipyard mortgaged in this transaction. Any extension of it would necessarily be on land under water

⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

then owned and expressly covered by the mortgage, or on land under water to be acquired afterward. This being obvious, the parties covenanted that the mortgage should cover after-acquired property, the clause reading:

"And all additions and extensions to said real property, including any and all rights to lands under water adjoining said premises, wherever acquired by the mortgagor."

The boundary line between New York and New Jersey crossed the island. The upland was mainly in New York. A portion of one pier, however, extended beyond the line into under water territory of New Jersey while the lands under water expressly covered by the mortgage extended to the pier headline in Newark Bay. In the nature of things it was probable that "any additions or extensions" would be carried into New Jersey. With this in view a covenant for further assurances was written in the mortgage requiring the mortgagor, when requested, to execute such mortgage instruments as may be necessary to "place under the lien of this mortgage any such additions of or to the real property herein mortgaged."

After obtaining title the Shipbuilding Corporation began to enlarge its plant by building additional shipways. For this purpose, in July, 1916, it acquired land under water by lease from the State of New Jersey with the right to convert the lease into a grant in fee upon payment of a principal sum equal to the capitalization of the yearly rental. With the lease in force and the expansion of the yard under way, the Shipbuilding Corporation, on April 17, 1917, regarding the land leased from the State of New Jersey as coming within the after-acquired property clause of the mortgage and acting pursuant to the covenant for further assurances, executed a supplemental mortgage to the Shooters Island Shipyard Company for the same principal debt covering all properties mentioned in the New Jersey lease.

This was the state of the title of the mortgaged premises when, the war being on, the United States Shipping Board Emergency Fleet Corporation, in August, 1917, requisitioned all ships under construction in its yard, and all materials and machinery, and commitments for materials and machinery, necessary for their completion. By this requisition the Shipbuilding Corporation was required to complete the construction of thirteen ships under contract and in the meantime to furnish the Fleet Corporation "any information necessary to a fair and just determination of [its] obligations in taking over these ships and contracts." This is where the trouble began, for by this requisition there was no contractual relation established between the Shipbuilding Corporation and the Fleet Corporation. Their relation, whatever it was, arose out of the requisition prompted by the exigency of war. Having made the requisition, the Fleet Corporation, representing the United States, then set about to determine its obligations for its act and to finance the completion of the ships. First, it assumed the obligation to repay the former owners of the ships under construction the advance payments they had made to the Shipbuilding Corporation amounting (speaking in round numbers) to $6,611,000. Out of this sum the Shipbuilding Corporation, having spent

part of the money on its plant, had expended upon the construction of six ships which were on the ways and in the purchase of materials for others only $1,700,000. The Fleet Corporation then supplied moneys for the completion of the requisitioned hulls and the building of other ships amounting in all to $18,083,000, payments, we gather, being made always in advance. Somewhere in these transactions contractual relations between the two corporations arose.

The requisition by the Fleet Corporation did not include the plant of the Shipbuilding Corporation. It left the plant where it was—in the title, possession and operation of the owner. It included only the ships under construction and under contract, and materials for their construction. The Fleet Corporation, nevertheless, advanced large sums of money to the Shipbuilding Corporation on account of ship construction and authorized expenditures therefrom for additions and improvements to the plant, aggregating something more than $5,000,-000. This was done without demanding security and, apparently, without thought of the mortgage held by the Shooters Island Company; certainly, so far as the record shows, without a move to question or disturb its lien upon after-acquired properties. Among these advances for plant improvement was one for $45,900, the purchase price of the land under water leased from the State of New Jersey. With this money the Shipbuilding Corporation, on November 29, 1918, under the option in the lease, acquired from the State of New Jersey a fee simple title to the leased land under water. This land with its shipways thus became a part of the shipbuilding plant of the Shipbuilding Corporation. Being acquired after the mortgage and the supplemental mortgage given the Shooters Island Company, the land on first view fell within the after-acquired property clause of the mortgage and came within its lien. We apprehend, if nothing else had happened, the lien of this mortgage would have been enforceable on foreclosure against this after-acquired land. And nothing affecting the lien did happen until, on February 5, 1920—the war having ended—the Shipbuilding Corporation and the Fleet Corporation, after protracted negotiations, entered into a contract adjusting their mutual accounts arising out of moneys advanced by the Fleet Corporation and moneys claimed by the Shipbuilding Corporation and striking a balance due the Fleet Corporation in the sum of $1,337,000. This agreement is important because it shows how the contracting parties regarded the mortgage held by the Shooters Island Company and how they dealt with it in the adjustment of their affairs. By this contract the Shipbuilding Corporation agreed to execute and deliver to the Fleet Corporation its bond or notes for the principal sum of $1,337,000,

"* * * such bond or notes to be secured by a mortgage satisfactory in form and substance to the Fleet Corporation and covering all the real and personal property of [the Shipbuilding Corporation] now owned or hereafter to be acquired; said mortgage shall be a first lien upon all said property, *subject only to the existing mortgage thereon* [held by the Shooters Island Company] *in the principal sum of Eight Hundred and Sixty-three Thousand Dollars ($863,000), or,* if the Fleet Corporation so elect, it may purchase and discharge, * * * *said existing mortgage;* in which event, the said bond or notes and the said mortgage to be given to the Fleet Corporation shall be in

the principal sum of Two Million Two Hundred Thousand Dollars ($2,200,000), *and said mortgage shall be an absolute first lien on the said property."*

The Shipbuilding Corporation accordingly executed a mortgage to the Fleet Corporation in the sum named. It contained the following recital:

"Whereas, there is now outstanding and unpaid a bond and mortgage heretofore given by the [Shipbuilding Corporation] to Shooters Island Shipyard Company to secure the payment of the principal sum of $863,000, * * * covering certain parts of said real estate of said mortgagor. * * * "

As this mortgage was accepted by the Fleet Corporation it must be assumed that it was, according to the contract, "satisfactory in form and substance." There can be no doubt that at the time of entering into the agreement and of the execution of the mortgage the Fleet Corporation had no other thought than that it was obtaining a mortgage for $1,337,000 whose lien upon the property was under and "subject to" that of the purchase money mortgage and supplemental mortgage held by the Shooters Island Company. Further evidence of this position is found in resolutions adopted by the Construction Claim Board of the Fleet Corporation on March 29, 1920, reciting the agreement of February 5, 1920, and stating that inasmuch as the Fleet Corporation should, in the opinion of the Board, own and control all first mortgages covering properties, it was recommended to the Board of Trustees of the Fleet Corporation—

"That, at the time of ratifying said fentative agreement, the Emergency Fleet Corporation purchase the outstanding first mortgage covering the property of the Standard Shipbuilding Corporation in the amount of $863,000 at the best price obtainable, * * * and that as soon as it can conveniently be done it satisfy said mortgage, and thereupon demand and accept of and from said Standard Shipbuilding Corporation its bonds or notes in the principal sum of $2,200,000, instead of $1,337,000. * * * "

The Trustees of the Fleet Corporation, however, entertained a different view, and, on March 30, 1920, by resolution ratified and approved the agreement of February 5, 1920, with a modification of one of its provisions, causing the contract to read:

That the Shipbuilding Corporation agrees to execute and deliver to the Fleet Corporation bond or notes for $1,337,000 "subject only to the existing mortgage thereon in the principal sum of Eight Hundred and Sixty-three Thousand Dollars ($863,000)."

The mortgage contemplated by the agreement of February 5, 1920, ratified March 30, 1920, subject to the mortgage to the Shooters Island Company, was accordingly delivered by the Shipbuilding Corporation to the Fleet Corporation under date of April 30, 1920, securing the principal sum of $1,337,000.

The record evidence of this transaction, concluding the business between the Shipbuilding Corporation and the Fleet Corporation, discloses nothing contrary to the expressed intention of the parties that the lien of the mortgage given the Fleet Corporation to secure the balance due should be subject to and therefore junior to the liens of the mortgage and supplemental mortgage held by the Shooters Island Company.

Two years elapsed. Then, in March, 1922, James Howden & Co., Limited, filed a creditor's bill against the Shipbuilding Corporation in the District Court of the United States for the Eastern District of New York and an ancillary bill in the District Court of the United States for the District of New Jersey upon which receivers were appointed. On application the two district courts granted the Shooters Island Company leave to foreclose its mortgage and supplemental mortgage against the mortgaged premises in the two jurisdictions. Two foreclosure suits were begun. The one in New York was prosecuted to judgment and execution, and the sale of the property in that state yielded about $400,000. The one in New Jersey was resisted by the Fleet Corporation, which, by cross-bill, sought to foreclose its mortgage for $1,337,000, alleging that the lien of its mortgage on property in New Jersey was prior to the lien of the earlier mortgage held by the Shooters Island Company. Later, the Fleet Corporation filed an original bill of foreclosure containing virtually the same allegations. So far as the record shows this was the first time the Fleet Corporation claimed priority of lien.

The three suits—one on the creditor's bill and two on bills of foreclosure—were tried together. On its senior mortgage for $863,000 the Shooters Island Company claimed a judgment for $551,541.64 (allowing a credit for the amount recovered in the New York proceedings) and asserted a prior lien. The Fleet Corporation claimed a judgment for the principal sum secured by its junior mortgage and priority by reason of one of several kinds of liens. The court entered a decree on the two mortgages for the amounts claimed but awarded priority of lien on the premises in New Jersey to the mortgage held by the Fleet Corporation and (against the demand of the receivers of the Shipbuilding Corporation) awarded the Fleet Corporation a lien on certain personal property. The receivers and the Shooters Island Company appealed.

On this appeal the Fleet Corporation first makes claim to priority under the lien of its mortgage against the Shipbuilding Corporation—a legal lien. In support of this claim the Fleet Corporation contends that neither the original mortgage nor the supplemental mortgage of the Standard Shipbuilding Corporation to the Shooters Island Company was sufficient to include the fee to the New Jersey land. This is based on the fact that the original mortgage covered land only (or mainly) in the State of New York and on the contention that, within a proper interpretation of the after-acquired property clause of the mortgage, any land thereafter acquired must be land in the same state. In support of its claim to legal priority the Fleet Corporation further contends that when the Standard Shipbuilding Corporation gave the supplemental mortgage to the Shooters Island Company covering land in New Jersey, it was only lessee of the land and therefore had no estate in it. If either position is sustained the liens of both the original and supplemental mortgages on New Jersey land are out of the way and the lien of the mortgage held by the Fleet Corporation is the first and only lien. We dispose of these two contentions by saying that if the supplemental mortgage is a valid instrument, whose lien attached to a

valid security, the question raised on the original mortgage falls out of the case. As the validity of the supplemental mortgage (distinguished from the priority of its lien) has not been challenged, or, at all events, has not been adversely decided,—it has, in effect, been sustained by the provision in the decree for postponed payment,—it follows that the lien of that mortgage relates to New Jersey land, whether it rests on that land and whether it is prior to other liens are other questions.

[1] The contention of the Fleet Corporation that the supplemental mortgage when given covered only the lease on New Jersey land under water with an option to buy, and that, in consequence, the Shipbuilding Corporation had no estate in the land, and, therefore, had nothing to mortgage, is contrary to Halsted v. Colvin, 51 N. J. Eq. 387, 26 Atl. 928, and to Point Breeze Ferry & Improvement Co. v. Bragaw, 47 N. J. Eq. 298, 301, 20 Atl. 967.

The Fleet Corporation next makes claim to priority by reason of an equitable lien. It contends that where riparian lands under water are reclaimed, the one paying the purchase price to the state and making improvements has the higher title and superior right, on judicial sale, to be first paid the price of such purchase and the cost of improvements, although the lands are subject to the lien of a prior mortgage. It bases this contention, as did the learned trial judge in entering the decree, on Point Breeze Ferry & Improvement Co. v. Bragaw, supra, maintaining further that as this is a New Jersey decision respecting property, it is binding on federal courts. But we distinguish this case, and also Halsted v. Colvin, supra, from the case at bar because in each the thing mortgaged was a bare right to buy and in neither did the mortgagor make the purchase but it was made and the purchase money paid by another person. In the case at bar the mortgagor purchased the leased land and paid the purchase price. The purchase money, to be sure, was a part of moneys advanced by or borrowed from the Fleet Corporation. The question of an equitable lien in favor of the Fleet Corporation based on its advance of the purchase price, is, therefore, narrowed to the question whether the mere advance or loan of money for the purpose named creates an equitable lien which displaces the prior legal lien of the mortgage held by the Shooters Island Company. This brings us to the character of after-acquired property as the subject matter of liens, senior and junior.

[2] A mortgage of after-acquired property was of no validity as a mortgage at common law. In equity, however, a mortgage of after-acquired property is treated as a contract to execute a mortgage on the property when acquired, and the court will decree specific performance of such contract. Upon the principle that equity regards that as done which ought to be done, equity treats the mortgage as attaching to the after-acquired property as soon as it is acquired, as if there were an actual mortgage then executed. Jones on Mortgages. §§ 149, 153; Jones, Corporate Bonds and Mortgages (2d Ed.) § 92; 27 Cyc. 1139–1141; 19 R. C. L. 409, 416, 417; Pennock v. Coe, 23 How. 117, 16 L. Ed. 436.

[3] In applying this principle, however, there is another to the effect that a mortgage intended to cover after-acquired property can

only attach to such property in the condition in which it comes into the mortgagor's hands. If that property is already subject to liens, legal or equitable, the after-acquired property clause of a senior mortgage does not displace them although they may be junior to it in point of time. United States v. New Orleans & O. R. Co., 12 Wall. 362, 20 L. Ed. 434. In other words, intervening liens remain and prevail. So it follows that if, at the time the Shipbuilding Corporation acquired title in fee to the New Jersey land, the Fleet Corporation had an equitable lien against it arising out of the fact that it was with its money that the purchase price was paid and improvements made, then the Shipbuilding Corporation acquired the land as it found it, namely, encumbered with a lien. If, however, the Fleet Corporation acquired no such lien on the land, then the lien of the Shooters Island Company's prior mortgage is not displaced and remains prior to the legal lien which the Fleet Corporation acquired under its mortgage about two years later. The claimed equitable lien, therefore, rests on the single fact that money which the Fleet Corporation loaned or advanced to the Shipbuilding Corporation under shipping contracts was used in the purchase and improvement of the land. That the Fleet Corporation intended it to be so used is evidenced by the warrant issued for the money and its expenditure, just as other moneys amounting to more than $5,000,000 were advanced and authorized to be expended in enlarging and improving many parts of the shipbuilding plant erected on the several tracts of land in the states of New York and New Jersey. No security was asked, and, so far as the record shows, no agreement was made for repayment of these funds. They were advanced on account of ship construction, and to facilitate and expedite that construction they were authorized to be expended upon the plant as well as upon the ships themselves. Unless we are to hold that such expenditures, singly and alone, create in each instance, wherever applied and expended, an equitable lien in favor of the party advancing the money, thereby divesting rights held under an existing mortgage, we are constrained to hold that the purchase of lands from the State of New Jersey and the building of ways thereon with moneys which the Fleet Corporation either loaned or advanced to the Shipbuilding Corporation do not, without more, give it an equitable lien on the properties so purchased and improved. We freely admit that under different circumstances an equitable lien could have been created which would have displaced the lien of the prior mortgage under its after-acquired property clause. But under the circumstances as they were, we are unable to find, either on authority or principle, that the rights of one silently and unconditionally loaning money for the purchase and improvement of property are superior to the rights of a party who holds the lien of a prior mortgage against the property. That the money was loaned under the compulsion of an urgent national necessity may justify what was done but does not disturb vested rights.

[4] True, the security of the first mortgage was greatly enhanced in value by the expenditures made upon it and stress is laid on the doctrine that equity will not permit a person to be unjustly enriched by the expenditure of another. But this doctrine is controlled by an element of injustice entering into the transaction which, in turn, in-

volves an element of misconduct or fault, or undue advantage taken by one party of another. We find nothing of the kind here. Shooters Island Company did not stand by and permit the Fleet Corporation to improve the property in ignorance of the fact that it was improving property covered by its mortgage. The Fleet Corporation knew, or should have known, what it was doing, and if, in the exigency of war, it decided to do what it would not do in peace, we see no reason why, in its relief, it should be helped and the prior lienor hurt.

[5] We come to this conclusion not on the theory of estoppel of or waiver by the Fleet Corporation in adjusting its differences with the Shipbuilding Corporation in 1922 and accepting a second mortgage in settlement, as urged by the Shooters Island Company, although there is substance in this contention, Griffin v. Smith, 143 Fed. 865, 75 C. C. A. 73, but on the ground that where the evidence shows nothing, expressly or impliedly, was demanded or promised by either party, an equitable lien is not raised by the mere loaning and application of money for purchases and improvements that were understood and intended.

[6] Passing from its alternative claims to legal and equitable liens, the Fleet Corporation next maintains that, having supplied the purchase money for the after-acquired property, its mortgage is a purchase money mortgage on the principle that an instrument may be a purchase money mortgage although given to a third person to secure money advanced by him. There is ample authority for this proposition. But even in such a situation the mortgage must be given for the purpose and with the intention of securing the purchase money and, without regard to the date, it must be a part of one continuous transaction. New Jersey Building Loan & Investment Co. v. Bachelor, 54 N. J. Eq. 600, 35 Atl. 745; Stewart v. Smith, 36 Minn. 82, 30 N. W. 430, 1 Am. St. Rep. 651. Here the mortgage was given the Fleet Corporation five years after the money was advanced and there is nothing to show an agreement that, at the time of the advance, repayment was to be secured by mortgage. It is, of course, not necessary that a deed and mortgage should be executed at the same hour, or even on the same day, provided, as the authorities say,

"the execution of the two instruments constitute part of one continuous transaction and were so intended. But where the mortgage is not executed until a considerable time after the deed, they cannot be construed as simultaneous and the mortgage will be postponed to intervening valid liens." 1 Jones on Mortgages, § 469; Bridges v. Cooper, 98 Tenn. 381, 39 S. W. 720.

Confining our consideration of this case strictly to principles of law and equity, applicable alike in times of war and times of peace, we are constrained to hold that the only lien which the Fleet Corporation holds against the real property in question is the legal lien of its mortgage, which, according to its terms, is subject to the lien of the first mortgage held by the Shooters Island Company, and therefore must be postponed in its enforcement to the lien of that mortgage. This part of the decree below is reversed.

The remaining issue is between the Fleet Corporation and the receivers of the Shipbuilding Corporation. It arose out of the purpose

of the Fleet Corporation, declared in its cross-bill, to treat the mortgage given it by the Shipbuilding Corporation as a chattel mortgage, as well as a mortgage on realty, and to proceed thereon against personal property named therein.  This is opposed by the receivers into whose hands the goods and chattels have come on the ground that as a chattel mortgage the instrument is void because it does not contain an affidavit by the mortgagee as to the consideration and was not recorded as required by the New Jersey Chattel Mortgage Act.  1 Comp. Stat. p. 463, § 4.  On this issue there is no dispute of fact, for, admittedly, the mortgage does not conform to the requirements of New Jersey law.  Notwithstanding its legal defects, the court sustained the mortgage as a chattel mortgage on the ground that the Fleet Corporation is a governmental agency (Sloan Shipyards Corporation v. United States Shipping Board, 258 U. S. 549, 42 Sup. Ct. 386, 66 L. Ed. 762), and as the government for which it was acting is not subject in its property rights to state laws (citing United States v. Snyder, 149 U. S. 210, 13 Sup. Ct. 846, 37 L. Ed. 705; Stanley v. Schwalby, 147 U. S. 508, 13 Sup. Ct. 418, 37 L. Ed. 259; United States v. Ansonia Brass Co.. 218 U. S. 452, 31 Sup. Ct. 49, 54 L. Ed. 1107), the Fleet Corporation was not required to comply with the New Jersey statute.

[7] We do not see just how these authorities controlled the court's decision.  They concern questions whether the laws of the United States—not actions by the United States—are, in their enforcement, subject to laws of the states, as, for instance, whether the tax system of the United States is subject to, and therefore capable of being defeated by, the recording laws of a state, and, of course, they hold for the national government.  But here we are not concerned with a conflict of sovereignty but merely with the enforcement of a debt by suit instituted either by the United States or by the Fleet Corporation, its agent, and are therefore dealing with entirely different principles. The first question therefore is (if the suit was brought by the United States), whether the government, voluntarily becoming a party and asking redress, is bound by the same rules that govern individuals.  Except when qualified and limited in certain cases as, for instance, by the rule that neither a statute of limitations nor laches will bar the Government of the United States in any claim for relief in a purely governmental matter (United States v. Adams [C. C.] 54 Fed. 114;  United States v. McElroy [C. C.] 25 Fed. 804; United States v. Southern Colorado C. & T. Co. [C. C.] 18 Fed. 273; United States v. Belknap [C. C.] 73 Fed. 19, 20; Pond v. United States, 111 Fed. 989, 995, 49 C. C. A. 582; United States v. Beebe, 127 U. S. 338, 344, 8 Sup. Ct. 1083, 32 L. Ed. 121; United States v. Insley, 130 U. S. 263, 9 Sup. Ct. 485, 32 L. Ed. 968), it is well settled that when the United States appears as a suitor it voluntarily submits to the law, places itself upon the same footing with other litigants, and is not entitled to remedies which cannot be granted to individuals (United States v. Beebe [C. C.] 17 Fed. 36; United States v. Barker, 12 Wheat. 559, 6 L. Ed. 728; United States v. Ingate [C. C.] 48 Fed. 251, 253; United States v. Bank, 96 U. S. 30, 24 L. Ed. 647; Lynch v. United States, 13 Okl. 142, 73 Pac. 1095; Brent v. Bank, 10 Pet. 596, 9 L. Ed. 547; Chesapeake & Dela-

ware Canal Co. v. United States, 250 U. S. 123, 126, 39 Sup. Ct. 407, 63 L. Ed. 889; Pond v. United States, 111 Fed. 989, 995, 49 C. C. A. 582).

[8, 9] But we believe that the Fleet Corporation, not the United States, is the real party-complainant in the cross-bill, and later in the original bill, and that under Sloan Shipyards Corporation v. Fleet Corporation, Astoria Marine Iron Works v. Fleet Corporation, and Fleet Corporation v. Wood, Trustee, 258 U. S. 549, 42 Sup. Ct. 386, 66 L. Ed. 762, though a governmental agency, it does not stand in the place of the government so as to share the immunities of the sovereign, but in its transactions as a distinct corporate entity it was bound to observe the law of the state in which it was doing business. In a purely business transaction it received what it claims to be a chattel mortgage executed and recorded not in conformity with the chattel mortgage laws of the state in which the instrument was executed and is sought to be enforced. As each state has a right to determine for itself under what circumstances such instruments may be executed, the extent of the rights conferred thereby, and the conditions of their validity, all touching the transfer of property—a matter primarily of state concern—federal courts accept the settled law of each state as decisive in respect to any case arising therein. Union Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 10 Sup. Ct. 1013, 34 L. Ed. 341. It is well settled in New Jersey, both by statutory provision and judicial decisions, that unless a chattel mortgage contains the appropriate affidavit required by the statute and is recorded within a named time, it is of no validity as against creditors or, in the case of receivership, as against receivers. Knickerbocker Trust Co. v. Penn Cordage Co., 62 N. J. Eq. 624, 629, 50 Atl. 459; Id., 65 N. J. Eq. 181, 188, 55 Atl. 231; Graham Button Co. v. Spielmann, 50 N. J. Eq. 120, 24 Atl. 571; Id., 50 N. J. Eq. 796, 27 Atl. 1033; Wimpfheimer v. Perrine, 67 N. J. Eq. 597, 600, 50 Atl. 356.

[10] Aside from its contention that the Fleet Corporation in prosecuting actions for the collection of debts due the United States is immune from the operation of state laws, the Fleet Corporation contends that the mortgage of the Shipbuilding Corporation, as affecting the personalty named, was in effect and in law a purchase money mortgage and as such is enforceable against the chattels described in it. We have not been persuaded that the Shipbuilding Corporation could give a purchase money mortgage on chattels in the face of the chattel mortgage law of New Jersey. We cannot find under any law of New Jersey, nor under general law, any lien which the Fleet Corporation has on the personal property of the mortgagor described as:

"All the raw material, steel, iron, lumber, fuel, oil supply, goods, wares and merchandise and products of the mortgagor's business whether manufactured or in process of manufacture, and all other tangible personal property, goods and chattels not hereinbefore conveyed of any and every kind, name and nature which the mortgagor may have in its possession or which may have been acquired by it."

We are therefore constrained to hold this property passed to and should remain with the receivers for liquidation and distribution. As to personal property described in the paragraph of the mortgage pre-

ceding the one quoted, part of which is joined to the realty and all of which is used "in and about the operation of the said plant and property, and the carrying on of the business of the mortgagor in the same," not having been specifically litigated as coming within or being outside the lien of the mortgage, we express no opinion. To the extent indicated, therefore, the decree below is reversed.